Daniel J. McDonald (#07935)
dan@mcdonaldfielding.com
**MCDONALD FIELDING, PLLC**
The Mill at Dry Creek
175 W. Canyon Crest Road, Suite 204
Alpine, Utah  84004
Telephone: (801) 610-0010
*Attorneys for Defendant*

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | | |
|---|---|---|
| RECOVERY LAND HOLDING, LLC, a Utah limited liability company | : : : | **MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM** |
| Plaintiff, | : : : : | |
| v. | : : | Civil No. 1:17-cv-00152-TS |
| CITY OF SOUTH OGDEN, and DOE DEFENDANTS 1 through X, | : : : : | Magistrate Judge Evelyn J. Furse Judge Ted Stewart |
| Defendants. | : : : | |

---

Defendant City of South Ogden, by and through its undersigned counsel, moves the Court pursuant to D.U. Civ. R. 56-1, for an order granting it summary judgment dismissing the Complaint with prejudice pursuant to Rule 56 of the Federal Rules of Civil procedure.

## INTRODUCTION AND RELIEF SOUGHT

This is a civil rights action brought by Plaintiff Recovery Land Holding, LLC aka "Brighton" against the City of South Ogden for the City's denial of Brighton's request to allow a 30,000 square foot, 32-bed, 16-staff, inpatient residential treatment center for persons recovering

from alcoholism and substance abuse addiction to be located in one of the City's residential neighborhoods. The City previously approved a 20-patient, 10-staff facility under a prior request for accommodation from the City's zoning ordinances, which prohibit more than four unrelated persons from living together in the same dwelling in residential zones. Brighton sued the City when it denied its request to increase its census by 12 patients.

Brighton advances three theories of liability under three different federal statutes—the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*; the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*  Brighton's three theories of liability are (1) disparate treatment discrimination, (2) disparate impact discrimination and (3) failure to grant a reasonable accommodation. The City seeks complete dismissal, with prejudice, of Brighton's First, Second, and Third Causes of Action under each of the three theories of liability asserted.

## BACKGROUND

The subject property, which is located at 6000 South 1075 East, South Ogden City, Utah ("Property"), is situated in an R-1-10 Residential Zoning District.  Section 10-14-21 of the City Code prohibits all "Group Living Arrangements," including a Residential Facility for Disabled Persons ("RFDP" or "RFDPs"), in the City's R-1-10 Residential Zoning District. A "Group Living Arrangement," as defined in section 10-2-1 of the City Code, is "[a] group living or congregate living arrangement where groups of more than four unrelated persons live together in a single dwelling or housekeeping unit" regardless of disability.  Section 10-2-1 of the City Code defines an RFDP to be "[a] residence in which no more than eight (8) Disabled Persons reside . . . ." Brighton had received a prior accommodation from the City in 2014 allowing 20 patients and 10 staff but sought a further accommodation from sections 10-2-1 and 10-14-21 of the City Code

under the federal Fair Housing Act, 42 U.S.C § 3604(f)(3)(B) ("FHA") to increase its census from 20 to 32 patients.

After the 2014 accommodation for 20 patients was granted, the City changed its procedures for handling accommodation requests under the Fair Housing Act, transferring authority to decide all accommodation requests from the Planning Commission to the newly-formed Accommodation Review Committee or "ARC."[1] On May 17, 2017, the ARC denied Brighton's request for the accommodation, finding, among other things, that Brighton had not carried its burden of demonstrating the accommodation was necessary or reasonable. Brighton appealed that denial to the City's appeal authority, Hearing Officer Jody K. Burnett, a Utah land use attorney. He affirmed the ARC's denial of Brighton's further accommodation request. This lawsuit followed.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

The following facts are undisputed:

1.     Brighton is a Utah limited liability company and a licensed residential treatment center for disabled[2] persons recovering from alcoholism and substance abuse. (Compl. at ¶ 1.)

2.     The City is a Utah municipal corporation and is located in Weber County, Utah. (Compl. at ¶ 2; Answer at ¶ 2.)

---

[1] The ARC is chaired by the City Manager and consists of the following five members: the City Manager, the City Planner, the Fire Chief, the Chief Building Official, and the City Attorney or their designee(s). The Police Chief, the City Engineer, and Public Works Director and any other persons designated by the ARC serve as advisors to the ARC.

[2] There has not been enough information or evidence provided by Brighton to determine whether all of the residents will be "handicapped." 42 U.S.C.A. § 3602(h). However, the City presumes, without conceding, that Brighton's patients would meet the definition of "handicapped" under federal law. The ADA and the Rehabilitation Act contain the same essential definition but use the term "disability" instead of "handicap."

3.      Brighton operates a facility located at 6000 South 1075 East, South Ogden, Utah, which sits on 19 acres consisting of the building and grounds of the former Mount Benedict Monastery.  (Compl. at ¶ 10; Answer at ¶ 10.)

4.      In 2014, the City approved a residential facility for persons with a disability at the Monastery Property.  (Compl. at ¶ 11; Answer at ¶ 11.)

5.      The approval authorized the facility to provide treatment for up to 20 people recovering from alcoholism and substance abuse.  (Compl. at ¶ 12; Answer at ¶ 12.)

6.      On March 10, 2017, Brighton filed an application for a reasonable accommodation from the City to allow it to provide treatment for up to 32 (from 20) people recovering from alcoholism and substance abuse ("Application").  (Compl. at ¶ 18; Answer at ¶ 18.)  A true and correct copy of the Application is found in the Appendix as **Exhibit 1**.

7.      On April 18, 2017, Brighton submitted a letter to the City to supplement the Application ("Supplement").  The Supplement addressed the newly-enacted City Ordinance No. 16-20, which set forth the City's regulations for RFDPs and Group Living Arrangements.  (Compl. at ¶ 19; Answer at ¶ 19.)  A true and correct copy of the Supplement is found in the Appendix as **Exhibit 2**.  A true and correct copy of Ordinance No. 16-20 is attached as **Exhibit 3**.

8.      The City's Accommodation Review Committee ("ARC") held a hearing to consider the Application on April 21, 2017.  (Compl. at ¶ 20; Answer at ¶ 20.)

9.      The ARC issued a May 17, 2017, Memorandum Decision denying the Application ("Memorandum Decision").  (Compl. at ¶ 21; Answer at ¶ 21.)  A true and correct copy of the Memorandum Decision is found in the Appendix as **Exhibit 4.**

10.     Brighton appealed the Memorandum Decision on May 26, 2017.  (Compl. at ¶ 24; Answer at ¶ 24.)  A true and correct copy of the appeal is found in the Appendix as **Exhibit 5**.

11.     Jody K. Burnett ("Hearing Officer") was selected by the City to act as Hearing Officer for the appeal of the Memorandum Decision.  (Compl. at ¶ 25; Answer at ¶ 25.)

12.     Brighton submitted an Appeal Letter to the Hearing Officer regarding the ARC's denial of the Application.  (Compl. at ¶ 26; Answer at ¶ 26.)  A true and correct copy of the Appeal Letter is found in the Appendix as **Exhibit 6**.

13.     On July 10, 2017, the City also submitted an appeal brief to the Hearing Officer.  (Compl. at ¶ 27; Answer at ¶ 27.)  A true and correct copy of the City's brief to the Hearing Officer is found in the Appendix as **Exhibit 7**.

14.     The Hearing Officer held oral argument on the appeal on July 13, 2017, and, at that hearing, Brighton supplemented the record with additional handouts and evidence, attached to the Appendix as **Exhibit 8**.

15.     On August 30, 2017, the Hearing Officer issued a decision denying Brighton's Appeal and affirming the ARC's decision.  (Compl. at ¶ 28; Answer at ¶ 28.)  A true and correct copy of the Hearing Officer's decision is found in the Appendix as **Exhibit 9**.

16.     This lawsuit was filed on September 29, 2017.  (Docket No. 2.)

17.     Brighton's July 31, 2018, Initial Disclosures, Appendix - **Exhibit 10**, identified Documents BRC00001-BRC0004491 as documents Brighton may use to support its claims in the case ("Brighton Documents").

18.     The Brighton Documents include documents used by the City Council to support the findings it made in Ordinance No. 16-20, which are found in the Appendix as **Exhibit 11**.

## ARGUMENT

### I.      STANDARD OF REVIEW.

Rule 56(a) of the Federal Rules of Civil Procedure requires the court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Under this standard, the moving party must first establish the absence of a genuine issue of material fact on the claims or elements as to which it is moving for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1168-1169 (10th Cir. 2010) ("The moving party has both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.") (internal quotation marks removed).

Then, "in response to a properly supported motion for summary judgment, a non-movant must produce sufficient evidence for a reasonable trier of fact to find in its favor at trial on the claim or defense under consideration." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). But "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). Thus, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249.

In considering whether a genuine dispute of material fact exists, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented. *See id.* at 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991). The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Sw. Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

## II.   OVERVIEW OF FEDERAL LAW.

While Brighton has sought relief under three federal statutes—the Rehabilitation Act, Title II of the Americans with Disabilities Act, and the Fair Housing Act—these three statutes have such similar origins, contain such similar wording, and are so interrelated that they are, for the most part, interpreted *in pari materia*. *See Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 748, 750-53 (7th Cir. 2006) (*en banc*).[3]  Importantly, for housing discrimination cases in the Tenth Circuit, they are typically interpreted under the same rubric, which is generally governed by Fair Housing Act precedent.  *See Cinnamon Hills Youth Crisis Center, Inc. v. Saint George City*, 685 F.3d 917, 919 & n.1 (10th Cir. 2012).   Additionally, Brighton's application was ostensibly made under the auspices of the Fair Housing Act.  (*See, e.g.,* Ex. 2 at § 2 ("**2.  Violation of the Fair Housing Act**); *id.* at pp. 854-56 ("If the City enforces the components of Ordinance No. 16-

---

[3] There are important differences, not relevant to this case.  For example, as noted by the Third Circuit in *Lapid-Laurel, LLC v. Zoning Bd. of Adjustment of the Township of Scotch Plains*, 284 F.3d 442 (3d Cir. 2002), "The FHAA borrows language from the Rehabilitation Act.  However, the FHAA and the Rehabilitation Act do not bear the significant similarities that justified importing the requirements of 29 C.F.R. § 1630 from the ADA to the Rehabilitation Act.  The informal interactive process that § 1630 describes applies specifically to an employer-employee relationship." There is no interactive process required in zoning cases.

*Id.* at 455-56.

20 that violate the FHA ….”); Consequently, unless noted otherwise herein, this brief analyzes Brighton's claims within the basic contours of the federal Fair Housing Act and assumes that the same analysis applies to the ADA and RA claims.

The FHA prohibits housing discrimination on the basis of "race, color, religion, sex, handicap, familial status, or national origin." *See generally* 42 U.S.C. § 3604. As with other civil rights statutes, there are three predominant theories of discrimination liability under the FHA— disparate treatment discrimination, disparate impact discrimination, and discrimination by failing to grant a requested reasonable accommodation when necessary. *See, e.g., Cinnamon Hills*, 685 F.3d at 919 (discussing disparate treatment); *id.* at 922 (discussing disparate impact); *id.* at 923 (discussing failure to accommodate). Brighton asserts each theory of discrimination.

However, the FHA is not some omnipotent trump card that renders cities impotent to enforce their zoning laws; nor does the FHA automatically waive local zoning laws whenever a person with a disability asks for an accommodation. The United States Supreme Court and federal appellate courts continue to recognize that "[l]and use planning and the adoption of land use restrictions constitute some of the most important functions performed by local government." *Bryant Woods Inn, Inc. v. Howard County*, 124 F.3d 597, 603 (4th Cir. 1997) (citing *FERC v. Mississippi*, 456 U.S. 742, 768 n. 30, 102 S.Ct. 2126, 2141 n. 30, 72 L.Ed.2d 532 (1982) ("regulation of land use is perhaps the quintessential state activity")). These courts continue to recognize that local land use ordinances—and, particularly, restrictions upon group living—may legitimately be enforced "to preserve 'the character of neighborhoods, securing "zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people."'" *Id.* (quoting *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 732-

33, 115 S.Ct. 1776, 1780, 131 L.Ed.2d 801 (1995) (quoting *Village of Belle Terre v. Boraas*, 416

U.S. 1, 9, 94 S.Ct. 1536, 1541, 39 L.Ed.2d 797 (1974))).  Cities may therefore have and enforce

ordinances that accomplish such purposes without fear of recrimination or breaching federal or

state statutes.

> For example, in *Bryant Woods Inn*, the court emphasized:

> In enacting the FHA, Congress clearly did not contemplate abandoning the deference that courts have traditionally shown to such local zoning codes. And ***the FHA does not provide a "blanket waiver of all facially neutral zoning policies and rules, regardless of the facts***," *Oxford House, Inc. v. City of Virginia Beach*, 825 F.Supp. 1251, 1261 (E.D.Va.1993), ***which would give the disabled "carte blanche to determine where and how they would live regardless of zoning ordinances to the contrary***," *Thornton v. City of Allegan*, 863 F.Supp. 504, 510 (W.D.Mich.1993). Seeking to recognize local authorities' ability to regulate land use and without unnecessarily undermining the benign purposes of such neutral regulations, Congress required only that local government make "reasonable accommodation" to afford persons with handicaps "equal opportunity to use and enjoy" housing in those communities. 42 U.S.C. § 3604(f)(3)(B).

*Bryant Woods Inn*, 124 F.3d at 603 (emphasis added).

In short, the anti-discrimination laws are not federal zoning laws.  They are laws designed

to prevent discrimination in housing, which only occurs when similarly situated groups of disabled

people are deprived of housing opportunities that are available to similarly situated groups of non-

disabled people.  The City may enforce its zoning laws so long as it does not result in *that* type of

discrimination.  Moreover, Fair Housing Act law in this jurisdiction changed rather significantly

in July, 2012, when the *Cinnamon Hills* decision was published.  That case, among others, is

discussed at length below.

### III.     BRIGHTON'S DISPARATE TREATMENT CLAIMS FAIL AS A MATTER OF LAW AND SHOULD BE DISMISSED, WITH PREJUDICE.

"There are two ways to prove intentional discrimination (or 'disparate treatment') …." *Cinnamon Hills*, 685 F.3d at 919.  First, a plaintiff can prove intentional discrimination with "direct proof of the city's discriminatory intent."  *Id.*  Second, it can use indirect proof  to "point[] to circumstantial evidence and invoke[] the familiar *McDonnell Douglas* burden shifting scheme originally spawned in the Title VII arena but long since equally entrenched in the FHA, ADA, and RA contexts."  *Id.*  Brighton's disparate treatment claims should be dismissed because Brighton has no direct or indirect proof of discrimination.

#### A.     There is no direct proof of discrimination.

"Direct evidence of discrimination is evidence which, if believed, proves that the decision in the case at hand was discriminatory—and does so without depending on any further inference or presumption."  *Id.*  For example, "if a city zoning official explicitly relies on a discriminatory policy in making the challenged policy decision, or if he makes discriminatory comments about the disabled while explaining his basis for the contested decision, that is direct evidence of discrimination."  *Id.* at 920.  There is no such evidence in this case.

Brighton claims that South Ogden City Ordinance No. 16-20 constitutes direct proof of intentional discrimination under the Fair Housing Act.  (*See, e.g.,* Ex. 2 at p. 854[4] ("Ordinance No. 16-20 violates the FHA.")  However, Brighton produced no proof of any "discriminatory intent" on the part of the City in enacting Ordinance No. 16-20. *See Cinnamon Hills*, 685 F.3d at 919.

---

[4] When references are made to page numbers of the exhibits, only the numerical page numbers are referenced.  For example, the prefixes—"SO" and "BRC"—that precede the numbers, as well as any extra zeroes, are omitted.

And there is no evidence that the City relied "on a discriminatory policy" when it enacted Ordinance No. 16-20.

Ordinance No. 16-20 defined all different types of "Group Living Arrangements" [5] involving unrelated persons—regardless of disability—and determined that such land uses were best suited for the R-4, R-4A, R-5, R-5A, R-5B, and R-5C zones, where they were allowed as permitted uses.  *See* City Code § 10-14-21.B. (Ex. 3 at p. 376).  Group Living Arrangements were allowed as conditional uses in the C3, C3zc(A), CP3, CP3 zc(A), C2, CP2, City Center "Core", City Center "General", Riverdale Road "General", and 40th Street "General" zones.  *Id.* § 10-14-21.C (Ex. 3 at pp. 376-77.)  Group Living Arrangements not expressly permitted within a zone were prohibited.  *Id.* § 10-14-21.A.

After careful study and considerable deliberation, the City made the following specific factual findings to justify its placement of Group Living Arrangements in zones other than its low-density residential zones:

> 1.  According to the latest U.S. Census data for South Ogden City, the average household size is 2.66 persons per household.  And, for the years 2010-2014, 86.9%

---

[5] The term was defined as follows:

> GROUP LIVING ARRANGEMENT:   A group living or congregate living arrangement where groups of more than four unrelated persons live together in a single dwelling or housekeeping unit, including, but not limited to, Assisted Living Unit, Boarding House, Lodging House, Nursing Home, Senior Housing, assisted living facility, nursing care facility, Residential Facility for Disabled Persons, dormitory, student housing, fraternity, club, institutional group, half-way house, convent, monastery, or other similar group living or congregate living arrangement of unrelated persons.   A Group Living Arrangement does not include clinics, medical or dental; hospital(s) or hospital/clinic.

*Id.* at p. 372, Section 1 (amending City Code § 10-2-1).

of individuals living in South Ogden City lived in the same house for 1 year or more.[6]

2.   Among other things, Group Living Arrangements tend to introduce transiency, congestion, increased traffic, increased parking and other urban problems and challenges into communities.[7]

3.   Regulation of Group Living Arrangements serves to preserve housing densities consistent with both reality (in terms of the average composition of single family households in South Ogden City) and the goals and objectives of the General Plan.  It also promotes permanence and stability in neighborhood composition.

4.   Regulating Group Living Arrangements is an essential aspect of fostering the goals of the General Plan and South Ogden City City's zoning scheme, which seeks uncrowded, stable (non-transitory) single family neighborhoods.

5.   The City also recognizes the need, in certain demonstrable circumstances, for individuals with handicaps or disabilities to live in a Group Living Arrangements.  For example, one of the most common types of group living arrangements for individuals with handicaps or disabilities is a residential treatment facility for recovering addicts.  The City has consulted experts in the field, expert reports and testimony submitted in other jurisdictions, and considered the scholarly literature on these type of facilities and recognizes the need to provide some type of accommodation to them.

6.   In order to fulfill the purposes of the General Plan while accommodating the demonstrable needs of individuals with handicaps or disabilities to live in Group Living Arrangements, which are generally prohibited for individuals without disabilities or handicaps, the City desires to clarify its ordinances and define its practices and policies with regard to these issues.

(Ex. 3 at pp. 370,71, ¶¶ 4-9.)

Far from expressing a discriminatory intent, these findings acknowledge the City's desire

to preserve the residential character of its neighborhoods, promote stability and reduce transiency

through the proper locating and placement of *all* Group Living Arrangements while

---

[6] *See* Ex. 11 at pp. 1478-1480.

[7] *See, e.g.,* Ex. 11 at pp. 1467-1477.

accommodating persons with handicaps or disabilities in certain types of Group Living

Arrangements.  Consequently, by enacting Ordinance No. 16-20, the City actually created a built-

in accommodation for up to 8 unrelated persons[8] to live in a dwelling in the City's residential

zones so long as they meet the definition of a "DISABLED PERSON"[9] under the City Code.  This

---

[8] This number was not randomly chosen.  Instead, the scholarly research relied upon by the City included Jason & Ferrari, *Oxford House Recovery Homes: Characteristics and Effectiveness*, Psychol. Serv. (May 2010), attached as Ex. 11, pp. 1300-1312, which noted, "The Oxford House organization recommends 8-12 individuals residing in each House (Oxford House, 2006)." *Id.* at p. 1306.  It also included a large study, James W. Conroy, Ph.D, *Size, Quality, and Cost of Residential Settings: Policy Analysis of Literature and Large Data Sets*, attached as Ex. 11, pp. 1313-1416, which concluded, among other things that larger institutional settings are detrimental to the delivery of services, "the evidence in favor of small groups for both productivity and member satisfaction is strong[,]" and "[s]tudies support the sociological evidence that group sizes are ideally kept small, meaning in the range near 5 people." *Id.* at p. 1317.  "There is no consensus on what constitutes the optimal number of people in a residence, but across an extraordinary variety of states and systems, qualities of life and outcomes drop measurably when there are 5 residents, and drop sharply when there are more than 6 residents." *Id.* at p. 1318. The City also considered Sigrid James, *What Works in Group Care? – A Structured Review of Treatment Models for Group Homes and Residential Care*, Child Youth Servs. Rev. 308-321 (February 2011), attached as Ex. 11, pp. 1417-1442, which concluded that for the positive peer culture model of treatment, treatment is "generally delivered in groups of 8 to 12 youth in 90-minute structured group meetings, which ideally occur five times per week over a six to nine month period." *Id.* at p. 1421. *See also id.* at 1435 ("Recommended group size: 8-12").  The City also considered the work, testimony and expert reports of local experts in the field of addiction recovery who both opined that groups of 6-8 residents is therapeutically effective and that there is no need for larger group sizes in residential treatment programs. *See* Ex. 11 at pp. 1443-1460 (James K. Ott, LCSW, CAI, CIP); at pp. 1461-63 (Jason P. Wootton, LCSW).

[9] Ordinance No. 16-20 and Section 10-2-1 of the City Code define this term as follows:

> DISABLED PERSON: A "Disabled Person" is a person with a physical or mental impairment that substantially limits one or more of a person's major life activities, including a person having a record of such an impairment or being regarded as having such an impairment; a person with a "Disability" under Title 57, Chapter 21 of the Utah Code, as amended; a person with a "disability" under 42 U.S.C. § 12102(1), as amended; and a person with a "Handicap" under 42 U.S.C. § 3602(h), as amended.  A "Disabled Person" does not include a person engaged in the current illegal use of, or addiction to, any federally-controlled substance, as defined in Section 102 of the Controlled Substances Act, 21 U.S.C. Sec. 802.

built-in accommodation is reflected in the newly-created definition of "RESIDENTIAL FACILITY FOR DISABLED PERSONS" or RFDP, which defines such a facility as a licensed facility "in which no more than eight (8) Disabled Persons reside[.]"  City Code § 10-2-1 (Ex. 3 at pp. 372-73). As mentioned, section 10-7A-2 of the City Code expressly makes such facilities a permitted use in the R-1-10 zone at issue in this case.

Creating a *preference* that *favors* disabled persons over similarly-situated groups of non-disabled persons by allowing up to 8 unrelated and *disabled* persons to live in an R-1-10 dwelling when no group of more than four unrelated and *non-disabled* persons has the same privilege is not a form of actionable discrimination.  Rather it is legally justified as a form of "benign discrimination" intended to accommodate groups of disabled persons. *Bangerter*, 46 F.3d at 1503. *See* 42 U.S.C. § 3615 ("Nothing in this subchapter shall be construed to invalidate or limit any law of a State or political subdivision of a State, or of any other jurisdiction in which this subchapter shall be effective, that grants, guarantees, or protects the same rights as are granted by this subchapter[.]"); *Cf.* 42 U.S.C. § 3604(8) ("Nothing in this subsection shall be construed to invalidate or limit any law of a State or political subdivision of a State … that requires dwellings to be designed and constructed in a manner that affords handicapped persons greater access than is required by this subchapter.")  It is an attempt to create a preference to accommodate the disabled, not limit them.  Rather than violating the law, this built-in accommodation goes beyond what the law requires.  Moreover, it is not the accommodation for 8 disabled persons that prohibits Brighton's intended use.  It is the across-the-board ban on Group Living Arrangements in the R-1-10 zone that prohibits Brighton's use of the Property.

The R-1-10 is one of the zones that does not allow Group Living Arrangements as a permitted use. It allows a single-*family* dwelling and an RFDP as permitted uses. *See* City Code § 10-7A-2.  But because Brighton has 20 (and wanted 32) patients, it is not a "family" under City Code § 10-2-1, which defines "family" to include "[n]ot more than four (4) unrelated persons living together as a single, nonprofit housekeeping unit."  And because Brighton has more than 8 patients it is not an RFDP. Consequently, Brighton's intended use is not allowed by City Code § 10-7A-2 as a result of the definitional changes made by Ordinance No. 16-20.

 However, restrictions on group living—the number of unrelated individuals that may live together in a single dwelling—and regulations as to where group living may or may not be located within a city have long been utilized in community planning and zoning schemes, are presumptively valid under traditional zoning law analysis, and have been routinely upheld by the courts, including the United States Supreme Court.  For example, in upholding a definition of "family" that limited the number of unrelated people who could live together in a residential zone at just two, the United States Supreme Court, in *Village of Belle Terre*, 416 U.S. at 9, recognized the problems that group living arrangements create (regardless of disability) and the legitimate zoning interests that cities have in regulating them, explaining as follows:

> The regimes of boarding houses, fraternity houses, and the like present urban problems. More people occupy a given space; more cars rather continuously pass by; more cars are parked; noise travels with crowds.
>
> A quiet place where yards are wide, people few, and motor vehicles restricted are legitimate guidelines in a land use project addressed to family needs. This goal is a permissible one …. The police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people.

*Id.  See also Edmonds*, 514 U.S. at 732-33 (quoting *id.*).

The Supreme Court has long recognized that local governments may legitimately implement community planning and zoning regulations to preserve "physical, aesthetic as well as monetary" interests of the community. *Berman v. Parker*, 348 U.S. 26, 33, 75 S. Ct. 98, 102, 99 L.Ed 27 (1954). "It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well balanced as well as carefully patrolled." *Id.*

"Congress clearly did not contemplate abandoning the deference that courts have traditionally shown to … local zoning codes[,]" and "the FHA does not provide a 'blanket waiver of all facially neutral zoning policies and rules, regardless of the facts[.]'" *Bryant Woods Inn*, 124 F.3d at 603 (quoting 825 F.Supp. at 1261). As the November 10, 2016, *Joint Statement of the Department of Housing and Urban Development and the Department of Justice, State and Local Land Use Laws and Practices and the Application of the Fair Housing Act* ("Joint Statement") explains:

> A local government may generally restrict the ability of groups of unrelated persons to live together without violating the [Fair Housing] Act as long as the restrictions are imposed on all such groups, including a group defined as a family. Thus, if the definition of a family includes up to a certain number of unrelated individuals, an ordinance would not, on its face, violate the Act if a group home for persons with disabilities with more than the permitted number for a family were not allowed to locate in a single-family-zoned neighborhood because any group of unrelated people without disabilities of that number would also be disallowed.

(Joint Statement § 13, ¶ 3.)

Ordinance No. 16-20 falls squarely within the guidance of the Joint Statement because, under the four-person limitation found in City Code § 10-7A-2, if 5-to-32 missionaries, if 5-to-32 college freshmen, or if a group of 5-to-32 millennials without disabilities wanted to live together at the Property they could not. Indeed, as explained above, rather than discriminating, Ordinance

No. 16-20 *favors* the disabled.  Moreover, by already giving Brighton an accommodation at 20 patients, the City has treated Brighton *more favorably* than similarly-situated groups of non-disabled persons instead of discriminating against Brighton.

In short, because the City Code bars all Group Living Arrangements in the R-1-10 zone except RFDPs, which enjoy a *favored*—not disfavored—status, there is no evidence that Ordinance No. 16-20 is facially and unlawfully discriminatory or that it was enacted with discriminatory intent.  To the contrary, it represents a carefully-considered legislative balancing of interests designed to accommodate the disabled that is entitled to substantial deference.  Because there is no evidence that "proves that the decision in the case at hand was discriminatory—and does so without depending on any further inference or presumption[,]" *Cinnamon Hills*, 685 F.3d at 919, Brighton's disparate treatment claims fail as a matter of law and should be dismissed, with prejudice.

### B.      There is no indirect proof of discrimination.

Under the "first step" of a claim for disparate treatment discrimination by indirect proof, Brighton "bears the obligation of coming forward with a *prima facie* case of discrimination, a case that must include evidence suggesting the city denied the variance *because of* the disability of [Brighton's]residents." *Id.* at 920 (citing *Butler v. City of Prairie Village*, 172 F.3d 736, 748 (10th Cir. 1999) (emphasis in original)).  This *prima facie* showing requires a plaintiff to "produce evidence suggesting that the city denied to it zoning relief granted to similarly situated applicants without disabilities." *Id.* at 920. "Or, if there are no similarly situated non-disabled applicants, [the plaintiff] must show the circumstances surrounding the denial of the variance support a reasonable

inference that the city would have granted to an applicant without disabilities the relief it denied [the plaintiff]." *Id.* Brighton has no such evidence.

"[T]o show intentional discrimination against handicapped residents of group homes, plaintiff was required to show 'that group homes for the non-handicapped are permitted' in the city and are not subject to the same onerous requirements" as group homes for the handicapped. *Id.* at 921 (quoting *Bangerter*, 46 F.3d at 1502). "Without that, [Brighton] lacks evidence that others have been granted the relief it was denied." *Id.*

For example, in *Cinnamon Hills* the Tenth Circuit held that summary judgment was warranted where no evidence was presented that "the most similarly situated non-disabled comparators" to a residential treatment facility, such as "boarding schools and housing for colleges and trade schools open to the non-disabled" and other forms of group living for the non-disabled, had "been granted zoning relief remotely like the requested variance." *Id.* As in *Cinnamon Hills*, there is no evidence in this case that other Group Living Arrangements for 32 unrelated, non-disabled persons have ever been allowed, are allowed, or would ever be allowed in the R-1-10 zone.[10] Consequently, Brighton's *prima facie* case for disparate treatment through indirect proof of discrimination also fails as a matter of law.

## IV. BRIGHTON'S DISPARATE IMPACT CLAIMS FAIL AS A MATTER OF LAW AND SHOULD BE DISMISSED, WITH PREJUDICE.

The theory of disparate impact liability under the FHA was only recently and cautiously recognized by the Supreme Court. *See Texas Dept. of Housing and Community Affairs v. The*

---

[10] The closest Brighton can come to showing that such a group was "granted zoning relief remotely like the requested variance[,]" *id.*, is the fact that this Property was once used as a convent that housed nuns. However, there was no evidence produced with Brighton's application that it ever housed more than 20 nuns.

*Inclusive Communities Project, Inc.*,  576 U.S. ___, 135 S. Ct. 2507, 192 L.Ed 2d 514 (2015).  In doing so, the Court cautioned that "[t]he FHA is not an instrument to force housing authorities to reorder their priorities."  135 S. Ct. at 2522.  It acknowledged that "[z]oning officials, moreover, must often make decisions based on a mix of factors, both objective (such as cost and traffic patterns) and, at least to some extent, subjective (such as preserving historic architecture)."  *Id.*  As mentioned in *Village of Belle Terre*, 416 U.S. at 9, and *Parker*, 348 U.S. at 33, aesthetic values such as this have always been recognized as valid zoning objectives because, as the Court acknowledged in *Inclusive Communities*, "[t]hese factors contribute to a community's quality of life and are legitimate concerns for housing authorities.  The FHA does not decree a particular vision of urban development." *Inclusive Communities*, 135 S. Ct. at 2523.

"Courts must therefore examine *with care* whether a plaintiff has made out a prima facie case of disparate impact and prompt resolution of these cases is important."  *Id.* (emphasis added). To that end, the Court held that disparate impact analysis under the FHA requires "[a] robust causality requirement[,]" *id.*, and other "safeguards" to ensure that disparate impact liability doesn't unduly "displace valid governmental … priorities, rather than solely ' remov[ing] … artificial, arbitrary, and unnecessary barriers[]'" to housing for protected classes under the FHA. *Id.* at 2524.

"Unlike a claim for disparate treatment, a claim for disparate impact doesn't require proof of intentional discrimination." *Cinnamon Hills,* 685 F.3d. at 922 (citing *Mountain Side Mobile Estates P'ship v. Sec'y of Hous. & Urban Dev.*, 56 F.3d 1243, 1252 (10th Cir.1995)).  Instead, "[t]o prove a case of disparate impact discrimination, the plaintiff must show that 'a specific policy caused a significant disparate effect on a protected group.'" *Id.* (quoting *Reinhart v. Lincoln Cnty.*,

482 F.3d 1225, 1229 (10th Cir.2007) (quotation omitted)). "This 'is generally shown by statistical evidence ... involv[ing] the appropriate comparables' necessary to create a reasonable inference that any disparate effect identified was caused by the challenged policy and not other causal factors." *Id.* (quoting *Mountain Side Mobile Estates*, 56 F.3d at 1253). However, "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Inclusive Communities*, 135 S.Ct. at 2523. Without such a "robust" causation requirement defendants would be "held liable for … disparities they did not create." *Id.*  "A plaintiff has not met its burden if it merely raises an inference of discriminatory impact"; rather, the plaintiff "must prove the practice actually or predictably results in …discrimination." *Tsombanidis v. West Haven Fire Dept.*, 352 F.3d 565, 575 (2d Cir. 2003) (internal quotations omitted) (alteration in original).

As with disparate treatment liability, a prima facie showing of disparate impact is made by first identifying the relevant comparator group.  And, as with disparate treatment analysis, "[t]he relevant comparison group to determine a discriminatory effect on the physically disabled is other groups of similar sizes living together[,]" and not single families, "[o]therwise, all that has been demonstrated is a discriminatory effect on group living."  *Gamble v. City of Escondido,* 104 F.3d 300, 306-07 (9th Cir. 1997).  Drawing a comparison "to 'a similarly sized family where the individuals were related by blood, marriage or adoption,' … [is] improper. It fails to include similar-sized groups that are not related by blood—[such as] seven college students wanting to live together, for example—but are still affected by the policy[,]" which is the proper comparator group. *Tsombanidis*, 352 F.3d at 577 (citations omitted). Once the relevant comparator groups

have been identified, the analysis then proceeds to a statistical comparison of the two comparator groups and their access to housing. *See id.*

Under this framework, it is impossible for Brighton to make out a case of disparate impact because, as demonstrated above, generally[11] all other Group Living Arrangements—the "appropriate comparables[,]" *Cinnamon Hills*, 685 F.3d at 922—are banned from the R-1-10 zone, resulting in complete parity of housing opportunity for similarly-situated groups of disabled and non-disabled persons. "And of course without evidence of a *disparity*, [Brighton] cannot make out a disparate impact claim." *Id. See also The Corp. of the Episcopal Church in Utah v. West Valley City*, 119 F. Supp. 2d 1215 (D. Utah 2000) (holding that when "Plaintiffs have conceded that all group homes, including sorority houses, would be excluded from the zone at issue" it "makes clear why Plaintiffs' claim for disparate impact must fail").

## V. BRIGHTON'S FAILURE TO ACCOMMODATE CLAIMS FAIL AS A MATTER OF LAW AND SHOULD BE DISMISSED, WITH PREJUDICE.

The FHA prohibits discrimination against persons with handicaps and provides that discrimination includes "a refusal to make reasonable accommodations … when such accommodations may be **necessary** to afford such person **equal** opportunity to use and enjoy a dwelling," 42 U.S.C.A. § 3604(f)(3)(B) (emphasis added). Brighton's failure to accommodate claims do not succeed for at least three reasons. First, since no comparable housing opportunities exist in the R-1-10 zone for similarly-situated groups of non-disabled persons, an accommodation to allow 32 patients to live together in an institutional setting for inpatient addiction treatment was

---

[11] Again, the *only* type of Group Living Arrangement allowed in the R-1-10 zone is RFDPs. Hence, there is no disparity of housing opportunity between the disabled and similarly-situated groups of non-disabled persons and, if there is, it's a disparity that gives the disabled a *greater* housing opportunity.

not "necessary" to provide them with an "equal" housing opportunity.  Second, Brighton failed to

carry its burden of proof to demonstrate by substantial evidence that an accommodation was

"necessary."   Third, Brighton failed to carry its burden of proof to demonstrate that an

accommodation was "reasonable."

> **A.** **There is no comparable housing opportunity.**

The goal of housing discrimination laws is not to enhance therapy, promote recovery, solve

the national drug addiction crisis, or to accommodate disabilities in general; it is to ensure *equal*

*housing* to persons with disabilities.  As the Tenth Circuit most recently explained in *Cinnamon*

*Hills*, 685 F.3d at 923:

> the FHA's necessity requirement doesn't appear in a statutory vacuum, but is
> expressly linked to the goal of "afford[ing] ... equal opportunity to use and enjoy a
> dwelling." 42 U.S.C. § 3604(f)(3)(B). And this makes clear that the object of the
> statute's necessity requirement is a level playing field in housing for the disabled.
> Put simply, the statute requires accommodations that are necessary (or
> indispensable or essential) to achieving the objective of equal housing opportunities
> between those with disabilities and those without.

*Id.*  According to the Tenth Circuit, the Fair Housing Act is intended "just to accommodate

disabilities affecting housing opportunities" and does not "seek[] to cure all ills."  *Id.* at 924.

"[T]he point of the reasonable accommodation mandate" is "to require changes in otherwise

neutral policies that preclude the disabled from obtaining 'the *same ... [housing] opportunities*

that those without disabilities automatically enjoy.'"  *Id.* at 923. However,

> while the FHA requires accommodations necessary to ensure the disabled receive
> the *same* housing opportunities as everybody else, it does not require *more* or *better*
> opportunities.

*Id.*

"It is not just amelioration of *any* effect of the disability that demands accommodation, but only amelioration of those effects which preclude the disabled individual from availing himself *of an otherwise available housing opportunity*." *Id.* at 924 (first emphasis in original, latter emphasis added). Consequently, federal law necessarily requires an analysis of what comparable housing opportunities are available to similarly-situated groups of non-disabled persons so that the City can ensure that it provides an equal housing opportunity to those with disabilities. Drawing the comparator groups in this way leads to the first insurmountable hurdle for Brighton's failure to accommodate claim—an accommodation is not "necessary" because there is no comparable housing opportunity for groups of unrelated, nondisabled persons to begin with.

As demonstrated above, "the most similarly situated non-disabled comparators" would be other forms of group living for unrelated, non-disabled persons, such as "boarding schools and housing for colleges and trade schools open to the non-disabled" and not single family dwellings with single, blood-related families. *Cinnamon Hills,* 685 F.3d at 921. *See also Bangerter*, 46 F.3d at 1502. Since there are no comparable housing opportunities, no accommodation is "necessary."

This outcome is dictated by the new causation-based analysis adopted by the Tenth Circuit in *Cinnamon Hills* and applied consistently and uniformly, in some measure, by appellate courts throughout the country.[12] Under that analysis, in determining whether an accommodation is

---

[12] *See, e.g., Cinnamon Hills,* 685 F.3d at 924; *Lapid-Laurel*, 284 F.3d at 459 ("[T]he plaintiff in [a] … reasonable accommodations case must establish a nexus between the accommodations that he or she is requesting, and their necessity for providing handicapped individuals an 'equal opportunity' to use and enjoy housing."); *Bryant Woods Inn,* , 124 F.3d at 604 ("The 'necessary' element … requires the demonstration of a direct linkage between the proposed accommodation and the 'equal opportunity' to be provided to the handicapped person. This requirement has attributes of a causation requirement."); *Smith & Lee Assoc.*, 102 F.3d at 795 ("Plaintiffs must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice.")

necessary, the relevant inquiry is whether failure to grant the requested accommodation "hurts handicapped people *by reason of their handicap*, rather than . . . by virtue of what they have in common with other people." *Wisconsin Cmty. Servs.,* 465 F.3d at 752 (alterations in original).

Since *no* Group Living Arrangements are allowed in the R-1-10 zone, the City Code does not hurt Brighton's residents by reason of their handicap.  It merely "discriminates" against group living, which is "what they have in common with other people." *Id.*  Consequently, according to the Tenth Circuit, "when there is no comparable housing opportunity for non-disabled people, the failure to create an opportunity for disabled people cannot be called necessary to achieve equality of opportunity in any sense." *Cinnamon Hills*, 685 F.3d at 923. *See also Forest City Daly Housing, Inc. v. Town of North Hempstead*, 175 F.3d 144, 152 n.9 (2d Cir. 1999) (holding that, "if there were no concurrent housing opportunities for non-disabled individuals, then defendants were not required to make reasonable accommodations in order to create such opportunities for disabled persons."); *Gamble,* 104 F.3d at 306-07 (discrimination against group living is not illegal).

**B.    Brighton failed to produce substantial evidence an accommodation was "necessary".**

Aside from the fact that no comparable housing opportunities exist, Brighton's failure to accommodate claims also fail as a matter of law because (1) Brighton failed to carry its burden of proof to demonstrate to the City by substantial evidence that an accommodation was necessary; (2) Brighton utilized a standard for demonstrating necessity that has been rejected by the Tenth Circuit; and (3) even if Brighton's rejected theory of necessity was valid, it failed to carry its burden of demonstrating necessity by substantial evidence.

### 1.      *Brighton failed to carry its burden of proof.*

Under the federal Fair Housing Act, it is the burden of the applicant/plaintiff "to demonstrate its … need for the accommodation to the City." *Keys Youth Servs., Inc. v. City of Olathe*, 248 F.3d 1267, 1275 (10th Cir. 2001). *See also Oxford House, Inc. v. City of Wilmington*, Civil No. 7:07-CV-61-F, 2010 WL 4484523 at 9 (E.D.N.C October 28, 2010) (unpublished), attached to the Appendix as **Exhibit 12** ("There is no dispute among the federal courts that the plaintiff bears the burden of proving the 'necessity' of a requested accommodation."). A City "cannot be liable for refusing to grant a reasonable and necessary accommodation if the City never knew the accommodation was in fact necessary." *Keys Youth Servs.*, 248 F.3d at 1275. Consequently, Brighton is not entitled to any type of presumption that group living for recovering addicts is "necessary."  It is not entitled to a presumption that group living *in a residential neighborhood* is "necessary." It is not entitled to a presumption that group living *in groups of 32 persons* is "necessary."  To the contrary, these are all things Brighton was required to demonstrate by substantial evidence.

This is due, in part, to the fact that courts have recognized that "not all recovering[] [addicts] need group living[,]" *Tsombanidis*, 352 F.3d at 577-78.[13] Therefore, applicants seeking an accommodation must show by "substantial evidence … their need to live in a group home

---

[13] Actually, to be more precise, the courts have noted that the "Oxford House's own experts" agree that not all recovering addicts need group living. *Id.*  The Oxford House is widely regarded as the largest and most prevalent operator of group housing in the world, offering "more than 900 independent Oxford Houses … both in the United States and abroad that provide homes for recovering alcoholics and drug addicts. Oxford Houses operate on the premise that people recovering from drug and alcohol addictions will remain sober if they live in a supportive environment." *Id.* at 570.

setting in a residential neighborhood, in order to facilitate their continued recovery from alcoholism and drug addiction," and that this need for group living is not shared by "non-handicapped persons to the same degree." *Id.* at 575. The Fair Housing Act has evolved such that accommodation requests must be handled on a case-by-case basis because there is great variety along the spectrum of addictions and addiction treatment.

For example, some addicts do not need any form of group living. *Id.* For them, outpatient treatment with the help of programs like Alcoholics Anonymous are sufficient. *See generally id.* For others, their recovery journey begins at short-term detoxification facilities. *See, e.g.,* Utah Code Ann. § 62A-2-101(39). Detoxified patients then typically graduate to intermediate intensive inpatient treatment facilities, like Brighton, with short-term stays of 30-90 days, where patients are typically isolated from (not integrated within) the outside community while they receive intensive supervised therapy and treatment in a restricted living environment. *See, e.g., id.* §§ 62A-2-101(37)-(41); Ex. 7 at pp. 924, 934. Patients graduating from those type of programs then usually advance to some form of residential group living in a recovery residence, sober living home or Oxford House. *Id.* § -(33).

This latter type of facility—a recovery residence, sober living home or Oxford House—falls within the wheelhouse of the Fair Housing Act cases. But these homes are quite different from inpatient facilities like Brighton. For example, in contrast to the short, 30-to-90-day stays of patients at intermediate intensive inpatient treatment facilities like Brighton, evidence introduced by the Oxford House operator and experts in *Tsombanidis* "'indicate[d] that the average length of stay in an Oxford House is thirteen months ….'" *Tsombanidis*, 352 F.3d at 570. Also, Oxford Houses operate on the following principals:

>The day-to-day affairs of Oxford Houses are governed democratically by the residents of each house without the presence of a medical or therapeutic professional. OHI has found that residents are more likely to succeed if houses are (1) located in single-family residential neighborhoods away from readily available drugs and alcohol; (2) close to sites for regular Alcoholics Anonymous and Narcotics Anonymous meetings; (3) near commercial areas substantial enough to provide easy access to basic necessities; (4) near a range of employment opportunities accessible by public transportation; and (5) large enough for a minimum of six people to live, yet small enough that bedrooms are shared by residents.

*Id.* at 570-71. *See also* Utah Code Ann. § 62A-2-101(33).

In contrast, Brighton's application describes a program where its patients are generally isolated from, not integrated within, the community. Family interaction is strictly structured and limited to once a month, with severely restricted visiting hours—hence "vehicle trips will increase once per month for the Facility's family program[,]" and on Sundays when "approved visitors are allowed to visit the Facility from approximately 2:30 p.m. to 5:30 p.m."  (Ex. 1, p. 381, ¶ c.) "[R]esidents of the existing Facility are not allowed to drive[.]" (*Id.*)   They are "shuttled to and from the Facility in 15-passenger vans." (*Id.*)   They are tightly supervised by medical and therapeutical professional staff, which "provide support to the residents 24 hours a day, 7 days a week." (*Id.* at p. 383, ¶ i.) Rather than being integrated into the neighborhood, they are isolated from it. Brighton admits "the Facility doesn't generate significant foot traffic in the neighborhood." (Ex. 2, p. 853, ¶ iv.) According to Brighton's application, "While new residents occasionally arrive at the Facility and old residents depart, these arrivals and departures are not perceptible to the neighbors." (*Id.*)

Brighton offered no expert testimony, no scholarly studies, and no evidence whatsoever, demonstrating that its patients require treatment to occur in a residential neighborhood in groups of 32 at this phase of their recovery. Additionally, Brighton offered no case law support for the

idea that a large inpatient treatment facility of this nature needs to be located within a residential neighborhood.  If there is such evidence or such case law, Brighton utterly failed to present it to the City or the Hearing Officer and the City is unaware of it.

This omission is fatal to its failure to accommodate claim because such evidence is now a staple for demonstrating necessity of an accommodation in Fair Housing Act cases.  *See, e.g., Tsombanidis*, 352 F.3d at 577 ("Oxford House's own experts noted that not all recoverings need group living …."); *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1227 (11th Cir. 2008) ("the expert opinion of Dr. Michael Maher[] … explained the therapeutic benefits of group living for recovering substance abusers" but "conceded that he had 'not made any specific assessment of a particular residence or the stability of that residence with regard to … group and relationship issues.'"); *City of Wilmington*, Civil No. 7:07-CV-61-F, 2010 WL 4484523 at 9 (E.D.N.C October 28, 2010), attached as Ex. 12 (affirming denial of an accommodation request from 8 to 9 residents in an Oxford House because, in part, there was no "'considerable undisputed and specific evidence' in this record why nine, rather than eight, residents are necessary for 'therapeutic reasons.'").

Because of Brighton's failure to produce the required substantial evidence, we really don't know what it is about its patients' disabilities that requires them to live in groups of 32 as opposed to 20 patients.  Brighton simply wants us to presume that all people suffering from substance abuse addictions need in-patient treatment in a groups of 32 located in a residential zone. However, as explained above, this is simply inadequate to meet the current evidentiary requirements of the FHA. Consequently, its failure to accommodate claims should be dismissed because the City "cannot be liable for refusing to grant a reasonable and necessary accommodation if the City never knew the accommodation was in fact necessary." *Keys Youth Servs.,* 248 F.3d at 1275.

### 2.      *Brighton relied on a standard rejected by the Tenth Circuit.*

Rather than demonstrating why its patients need treatment in groups of 32 in residential neighborhoods, Brighton urged the City to espouse an entirely different paradigm for demonstrating an accommodation was "necessary." Under the paradigm tendered by Brighton, an accommodation can be shown to be "necessary" when there is a general market need for such housing coupled with an available facility that can ameliorate that need.  Brighton argued that an accommodation from 20 to 32 patients is necessary because there is allegedly a shortage of inpatient treatment options for those addicted to drugs due to Utah's opioid addiction crisis. Making this facility available to addicts is "necessary" to ameliorate their addictions.  The problem with this view is that it is incompatible with the causal nexus analysis of *Cinnamon Hills* discussed above and was, in fact, rejected in *Cinnamon Hills*.

The treatment facility operator in *Cinnamon Hills* relied upon this same amelioration rationale,[14] which runs through a line of cases, including *Bryant Woods Inn*, 124 F.3d at 604.  This rationale is that "an accommodation should be held 'necessary' anytime it would 'provide [] direct amelioration of a disability's effect.'" *Cinnamon Hills*, 685 F.3d at 924 (citing the Appellant's Brief, attached to the Appendix as **Exhibit 13** (citing *Bryant Woods Inn*, 124 F.3d at 604)).  The operator in *Cinnamon Hills*, after referencing several cases where this lower amelioration standard was purportedly applied, attacked the district court's finding that no necessity had been demonstrated because, according to the district court, the alleged need for treatment could have been met by housing the facility in another zone where they were allowed and, therefore, the city's

---

[14] The undersigned counsel represented the City of St. George in the *Cinnamon Hills* case.

denial was not the "but for" cause of the disabled's inability to enjoy housing.  (*See* Ex. 13 at pp.

58.)

> The operator argued in its brief to the Tenth Circuit:
>
>> The District Court's analysis of whether the requested accommodation is "necessary" is flawed in this case because, instead of deciding whether or not the desired accommodation would affirmatively enhance quality of life by ameliorating the effects of a disability, the court imposed the faulty 'but for' analysis set forth in *Wisconsin Community Services*….
>
>> Cinnamon Hills presented extensive evidence showing the necessity of the step down program as an amelioration of the effects of the students' disabilities, which the court did not find germane. This included, but was not limited to, the necessity to avoid disruption in treatment caused by the economic downturn, and the necessity for keeping already damaged youth in a setting in which they had succeeded, and doing so at a lower [c]ost.  Cinnamon Hills … is losing money on the operation.  [The facility] could be utilized to meet the needs of the disabled students.
>
>> Instead, the district court decided that because the facility could theoretically be built elsewhere, the requested accommodation was not necessary.

(*Id.* at 57-58.)

Just as Brighton argues that there is a general societal need that its facility can meet, in

*Cinnamon Hills*, the treatment facility operator argued that there was a need to "ease the transition

of emotionally and mentally troubled youth from residential treatment back into society" that *its*

facility could meet.  *Id.* Like Brighton, the operator in *Cinnamon Hills* argued "that, in the vast

majority of cases, suitable alternate facilities cannot be found" for its patients. (*See id.* at p. 29

(noting the testimony of Dr. Rachel Wheeler, a psychiatrist).) However, the Tenth Circuit rejected

this market-need-for-treatment and amelioration analysis, holding that it "overlooks the statute's

language linking a defendant's accommodation obligations to the goal of providing 'equal

opportunity to enjoy a dwelling.'" *Cinnamon Hills*, 685 F.3d at 924.  After all, it is the Fair *Housing* Act, not the Fair and Equal Access to Treatment Act.

Making specific reference to this market-need-for-treatment means of trying to establish an accommodation is "necessary," the *Cinnamon Hills* court soundly rejected the notion that necessity can be shown merely by pointing to a market need of the disabled that the proposed facility can meet. As it explained:

> On Cinnamon Hills's view, defendants would be required to ameliorate any effect of a disability—even if doing so only affects the disabled person's chances of getting a job or playing a sport and has nothing to do with enjoying a home. Under Cinnamon Hills's reading, the Fair Housing Act would require landlords not just to accommodate disabilities affecting housing opportunities but to operate as a sort of clinic seeking to cure all ills. And that is not what the text or purpose of this statute requires.

*Id.*  Since the Fair Housing Act is not designed "to cure all ills" (including drug addiction epidemics), Brighton's argument that there is a market need for treatment services that its facility could meet is no different than the argument rejected in *Cinnamon Hills* and is insufficient to demonstrate an accommodation was "necessary" within the meaning of the Fair Housing Act.

Instead, in the Tenth Circuit, an applicant seeking an accommodation must demonstrate that but for his/her disability, he/she would have been able to enjoy the type of housing sought. There must be evidence "that the disabled, *because of* their disabilities, are … less able to take advantage" of housing opportunities "than the non-disabled."  *Id.*  In adopting this rule of causation and comparison, the Tenth Circuit expressly adopted the *en banc* analysis of the Seventh Circuit in *Wisconsin Community Servs.*, 465 F.3d 737, where the court held that the City of Wisconsin was not required to waive its conditional use permit requirements to allow a proposed mental health clinic in an area of the city where health clinics were permitted only on a case-by-case basis.

In the *Wisconsin Community Services* case, the treatment facility wanted to locate its facility in a zone that allowed "foster homes, shelter care facilities, community living arrangements and animal hospitals either as 'permitted' or 'limited' (no special approval required) uses," *id.* at 741, and essentially asked that it be treated the same as these facilities by having the City of Milwaukee waive the "special use"[15] conditions contained in its zoning ordinance.  The treatment facility's desire for this particular site was motivated largely by market concerns rather than any linkage between the physical attributes of the desired site and its patients' disabilities.

For example, the record indicated that the treatment facility ("WCS") needed the space because its current space was overcrowded, a remodel of its current space would be too costly, *id.* at 741, and "suitably zoned"  alternatives "were either unavailable or too costly," *id.* at 744.  *See also Id.* at 754 (citing *Giebeler v. M&B Assocs.*, 343 F.3d 1143 (9th Cir. 2003)).  However, because these spatial, economic and market realities were not caused by the residents' disabilities the court held that no accommodation was necessary—"the mental illness of WCS' patients is not the cause-in-fact of WCS' inability to obtain a suitable facility" and, therefore "does not hurt persons with disabilities '*by reason of their handicap*.'"  *Id.* (citing *Hemisphere Bldg. Co. v. Vill. of Richton Park,* 171 F.3d 437, 440 (7th Cir. 1999) (emphasis in original)).

As the Seventh Circuit clarified:

> The "equal opportunity" element limits the accommodation duty so that not every rule that creates a general inconvenience or expense to the disabled needs to be modified.  Instead, the statute requires only accommodations necessary to ameliorate the effect of the plaintiff's disability so that she may compete equally with the non-disabled in the housing market. We have enforced this limitation by asking whether the rule in question, if left unmodified, hurts "handicapped people

---

[15] It appears that a "special use" in Milwaukee is akin to the more familiar "conditional use" concept utilized in Utah.

> *by reason of their handicap,* rather than . . . by virtue of what they have in common
> with other people, such as a limited amount of money to spend on housing."

*Id.* at 749 (citations omitted).

So, for example, this causation-based line of cases rejects financial or market necessities
as valid considerations, holding that "[t]o require consideration of handicapped people's financial
situation would allow developers of housing for the handicapped to ignore not only the zoning
laws, but also a local building code that increased the cost of construction, or for that matter a
minimum wage law, or regulations for the safety of construction workers. Anything that makes
housing more expensive hurts handicapped people; but it would be absurd to think that the FHAA
overrides all local regulation . . . ."  *Hemisphere Bldg.*, 171 F.3d at 440.  The core rationale of the
causation-based line of cases is that "the law addresses the accommodation of handicaps," and not
the advancement of available "economic []advantages," such as exploitation of a public health
crisis, or "the alleviation of economic disadvantages that may be correlated with having
handicaps."  *Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 301 (2d Cir. 1998).

In sum, by expressly adopting the *Wisconsin Community Services* rationale and aligning
itself with the Seventh Circuit, the Tenth Circuit rejected the line of cases holding that necessity is
shown simply by demonstrating that an accommodation will meet a market need or ameliorate the
situation of the disabled, *Cinnamon Hills*, 685 F.3d at 924, and adopted, instead, a causation and
comparison analysis that, for example, would require Brighton to demonstrate that people with
drug or alcohol addictions have no choice but to live in groups of 32 persons[16] in residential zones

---

[16] Brighton would need to show that, for those seeking in-patient treatment for drug and alcohol
addictions, getting short-term treatment in residential neighborhoods and living in groups of 32 for
the duration of their treatment is as necessary to them as, for example, an exemption from a "no
pets" policy in a condominium complex would be to a blind woman who needs a seeing eye dog

*and because of this* they are denied housing *available to those without such disabilities*. *See id.* Pointing to an operator's desire to make a profit, general market conditions, a shortage of inpatient treatment facilities, or the opioid crisis in Utah as causes that the requested expansion could ameliorate is insufficient.  That doesn't show an accommodation is "necessary."

Consequently, the ARC was correct in stating, "[Brighton]'s concerns about Utah's opioid epidemic and what it claims to be a shortage of *treatment* options in Weber County is not a viable approach to analyzing fair *housing* concerns under the Tenth Circuit's approach."  (Ex. 4 at 892.) And the Hearing Officer was correct in holding, "I agree with ARC's interpretation of the controlling precedent in the Tenth Circuit as reflected in the decision in *Cinnamon Hills Youth Crisis Center, Inc. v. St. George City*, 685 F.3d 917 (2012)."  (Ex. 9, p. 1188.) Brighton's attempt to show a market need for inpatient addiction treatment and that its facility could meet that need was insufficient to demonstrate that an accommodation was "necessary to afford [an] equal opportunity to use and enjoy a dwelling" under the text of 42 U.S.C. § 3604(f)(3)(B).

---

(meaning she could not live there, function and enjoy housing without the dog).  *See id.*  Brighton needed to show that living in an R-1-10 zone and living with 32 other patients in that zone is as essential to the ability to function, use and enjoy a home as, say, a first-floor apartment is necessary to a person who cannot physically navigate stairs.  *Id.*  There must be some convincing, disability-necessitated, disability-caused reason to justify group living in a residential zone to begin with and, if that is established, there must be a disability-necessitated reason to justify the precise number requested as opposed to some other number.  In other words, just as a disabled person's disabilities may necessitate a "type 8" wheelchair as opposed to a "type 32" wheelchair, an addicted person's specific addiction and recovery issues may necessitate only a "size 8" as opposed to a "size 32" accommodation. For an interesting (and entertaining) discussion of how *Cinnamon Hills* and the term "necessary" have been interpreted by other circuits *see Vorchheimer v. The Philadelphian Owners Ass'n*, __ F.3d __, No. 17-1738 (3rd Cir. September 5, 2018) (describing the but for causation standard of demonstrating an accommodation is "necessary" as "a high standard" and one that is "stringent"), attached as **Exhibit 14**.

### 3. Even if Brighton's rejected theory of necessity was valid, it nonetheless failed to carry its burden of demonstrating necessity.

Even if Brighton's market necessity approach was theoretically viable in the Tenth Circuit, there is still not adequate proof that the market necessitates 32 patients be located on the Property. For example, in the Fourth Circuit, where general market needs can be considered, the court held in *Bryant Woods Inn* that evidence of vacancies in other facilities meant an increase in the treatment facility's census from 8 to 15 residents was not "necessary." Because the market could absorb the group home residents that could not be accommodated at Bryant Woods Inn due to the 8-person zoning limitation in that case, the court held:

> A handicapped person desiring to live in a group home in a residential community in Howard County can do so now at Bryant Woods Inn under existing zoning regulations, and, if no vacancy exists, can do so at the numerous other group homes at which vacancies exist. The unrefuted evidence is that the vacancy rate was between 18 to 23% within Howard County. We hold that in these circumstances, Bryant Woods Inn's demand that it be allowed to expand its facility from 8 to 15 residents is not "necessary," as used in the FHA, to accommodate handicapped persons.

*Id.* at 605.

In *Smith & Lee Assoc. v. City of Taylor*, 102 F.3d 781, 795 (6th Cir. 1996), another prominent case applying the market necessity approach, evidence was introduced of a market shortage. *Smith & Lee Assocs., Inc.*, 102 F.3d at 789. Evidence was introduced that a competing facility had a waiting list for potential disabled residents. *Id.* There was also "expert testimony that, over the next thirty-five years, the number of older adults living in the State … who suffer from dementia would increase by seventy-seven percent." *Id.* In *Smith & Lee* there was also a finding that group homes for the elderly, in general, "are not economically viable when limited to six residents … because such AFCs do not receive state subsidies to cover operating costs." *Id.*

The testimony of the group home's expert witness in *Smith & Lee* also established that "it is no longer economically feasible for AFC homes for the elderly disabled to operate with fewer than nine residents." *Id.*

To support its market necessity theory, Brighton offered the ARC a single brochure from the Utah Department of Health entitled "Prescription Opioid Deaths." (Ex. 1., Ex. H., pp. 427-30.) However, Brighton did not offer any testimony from qualified witnesses, experts or any other evidence, and this brochure failed to establish what the market for inpatient treatment facilities was in Utah, whether there is a shortage of such facilities, or, for example, whether such facilities generally have vacancies, as is required by the market necessity line of cases. Consequently, the ARC correctly concluded, "[t]hese cases suggest that even if the market necessity approach was a valid approach in the Tenth Circuit (which it likely isn't), [Brighton] must present the type of evidence offered in these case[s] to show a market necessity. This was not done: there was no such evidence presented to the ARC by [Brighton]." (Ex. 4 at p. 891.)

In its appeal from the ARC's decision, Brighton presented the Hearing Officer new information it failed to present to the ARC—Utah's Division of Substance Abuse and Mental Health's 2016 Annual Report. (Ex. 6, Ex. B, pp. 988-1161.) However, even according to Brighton's own discussion of that report, the information provided only shows that the government-operated, *public* delivery systems for addiction treatment are able to serve 10% of the state's addicted population and 13% of Weber County's addicted population. (Ex. 6 at p. 975.) However, there was no evidence offered as to what percentage of the addicted populations required inpatient treatment. There was also no evidence offered as to how many *private* treatment facilities

exist statewide and whether these private treatment facilities were inadequate to treat that subset of the addicted populations.

Brighton argued that "[b]ased on Office of Licensing records and [Brighton]'s understanding, Weber County has a maximum potential of 28 beds for private residential treatment for adults[]" while the county "has 9,692 adults with substance abuse disorders who are not treated in the public system." (Ex. 6 at p. 976.) However, there was no foundational testimony offered from any witness explaining how Brighton obtained this data, who obtained this data, or whether Brighton's review of the current inpatient treatment market in Weber County was accurate or thorough.  Importantly, there was no evidence or testimony explaining how many of the 9,692 adults with substance abuse disorders require inpatient treatment and, of those requiring inpatient treatment, how many are unable to find it.

In short, even if market necessity was a viable approach in this jurisdiction, Brighton failed to produce the quantum of evidence required by cases like *Bryant Woods Inn* or *Smith & Lee Assocs.* Brighton's failure to produce sufficient evidence under this standard means that even under the market necessity approach, "the City never knew the accommodation was in fact necessary" and cannot, therefore have liability to Brighton. *Keys Youth Servs.*, 248 F.3d at 1275.  Accordingly, the failure to accommodate claims should be dismissed with prejudice under any theory asserted.

### C.    Brighton failed to demonstrate its accommodation was reasonable.

Brighton's failure to accommodate claims also fail because Brighton did not demonstrate that its requested accommodation was reasonable.  *See id.* at 1276 (placing burden of

demonstrating reasonableness on the applicant).[17] An accommodation is not reasonable if it requires a fundamental alteration in the nature of a program. *Schwarz*, 544 F.3d at 1220. "[O]rdering a municipality to waive a zoning rule would ordinarily cause a 'fundamental alteration' of its zoning scheme if the proposed use was incompatible with surrounding land uses[,]" which is the case here. *Id.* at 1221. As the ARC correctly concluded, Brighton's accommodation is unreasonable because, among other things, it results in higher per-unit police/fire calls than a residential dwelling, increases dwelling occupancy densities, introduces uncharacteristic neighborhood transiency, and intensifies an already distinctly uncharacteristic institutional use in a residential neighborhood. (*See* Ex. 4 at pp. at 893-96.)[18]

---

[17] *See also Loren v. Sasser*, 309 F.3d 1296, 1302 (11th Cir. 2002) ("Under the Fair Housing Act, plaintiffs have the burden of proving that a proposed accommodation is reasonable."); *Groner v. Golden Gate Gardens Apts.*, 250 F.3d 1039, 1045 (6th Cir. 2001) ("the plaintiff in a Fair Housing Act case has the burden of proof to establish the reasonableness of a proposed accommodation"); *Elderhaven, Inc. v. City of Lubbock*, 98 F.3d 175, 178 (5th Cir. 1996) ("we reject the suggestion of certain courts that a Fair Housing Act defendant bears the burden of proof on the question of reasonableness"). *Cf. Colorado Cross Disability Coalition v. Williams,* 264 F.3d 999,1005-06 (10th Cir. 2001) (holding in a Title III ADA case that the plaintiff bears the initial burden of production to show that barrier removal is readily achievable).

[18] "[O]ver half of South Ogden's residences are just under 1/4-acre in size. Small pockets of 1/8 to 1/4 acre lots occur throughout the city, with the largest lots typically being between 1/4 and 1/3 acre, and a small portion over 1/2 acre." (Ex. 7 at p. 912 (quoting General Plan).) According to United States Census Bureau data, the average number of persons per household in the City is 2.66. (*Id.* at p. 923.) Brighton is proposing a density that (without staff) is almost 16 times the average household density in the City. In contrast to the 30-to-90 day stays for Brighton's patients, transiency is relatively minimal in South Ogden's residential neighborhoods with 86.9% of persons living in the same home for more than one year. (*Id.* at p. 924.) *See, e.g., Schwarz*, 544 F.3d at 1223 (relaxing an occupancy-turnover rule to accommodate two halfway houses in a residential zone would amount to a fundamental alteration of the City's zoning scheme).

## **CONCLUSION**

The City passed a facially-neutral ordinance that bans all Group Living Arrangements in the R-1-10 zone, regardless of disability, because it was concerned about the deleterious effects of congregate living on its residential neighborhoods, which are characterized by smaller lots, lower dwelling densities, as well as a distinct lack of transiency and institutional living.  As the federal courts have consistently and repeatedly recognized, and as HUD and the Department of Justice have expressly stated, the Fair Housing Act does not give Brighton carte blanche to ignore those valid objectives or impose liability upon the City for promoting them.

The City's four-person limitation on unrelated persons is an equal opportunity offender targeted at the problems group living causes neighborhoods in the City's residential zones.  What are *not* equal opportunity offenders are the City's built-in accommodation allowing up to 8 unrelated, disabled persons to live in its residential zones and its previous accommodation of Brighton at 20 patients.  If the City is guilty of discrimination in this case it is benign and actually favorable to the disabled.  Brighton was accommodated at 20 patients because, the best the City can determine, that was the largest census ever allowed to any group of unrelated, non-disabled persons (nuns) in this zone.  Consequently, accommodation at 20 patients was necessary to afford an *equal* housing opportunity.  But the increased census Brighton subsequently requested is neither demonstrably "necessary" nor reasonable to achieve equality of housing opportunity in any sense, as demonstrated above.  Consequently, its claims against the City should be dismissed with prejudice.

**DATED** this 14th day of November, 2018.

MᴄDᴏɴᴀʟᴅ Fɪᴇʟᴅɪɴɢ, PLLC

/s/ Daniel J. McDonald

_____

Daniel J. McDonald
*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 14th day of November, 2018, I caused a true and correct copy of the foregoing to be served by electronic court filing notification through the Court's CM/ECF system to all participants of record.


                                                /s/ Daniel J. McDonald

## **APPENDIX**

1. Application (for reasonable accommodation)

2. Supplement (to application for reasonable accommodation)

3. Ordinance No. 16-20

4. Memorandum Decision (of the Accommodation and Review Committee)

5. Appeal from Memorandum Decision

6. Appeal Letter (Brighton submitted to Hearing Officer)

7. City's brief to Hearing Officer

8. Brighton supplements to the record to Hearing Officer

9. Hearing Officer's decision

10. Plaintiff's Initial Disclosures

11. Documents Supporting Findings for Ordinance No. 16-20

12. *Oxford House, Inc. v. City of Wilmington*, Civil No. 7:07-CV-61-F, 2010 WL 4484523 at 9 (E.D.N.C October 28, 2010)

13. Appellant's Brief in *Cinnamon Hills Youth Crisis Center, Inc. v. St. George City*, 685 F.3d 917 (2012)

14. *Vorchheimer v. The Philadelphian Owners Ass'n*, __ F.3d __, No. 17-1738 (3rd Cir. September 5, 2018)