Timothy J. Dance (11553)
Kristen J. Overton (16537)
**Snell & Wilmer L.L.P.**
15 West South Temple, Ste. 1200
Salt Lake City, Utah 84101
Telephone: (801) 257-1900
Facsimile: (801) 257-1800
Email: tdance@swlaw.com
           koverton@swlaw.com

*Attorneys for Recovery Land Holding LLC*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| RECOVERY LAND HOLDING, LLC, a Utah limited liability company,<br><br>       Plaintiff,<br><br>vs.<br><br>CITY OF SOUTH OGDEN, and DOE DEFENDANTS I through X,<br><br>       Defendants. | **MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:17-cv-00152 PMW<br><br>Magistrate Judge Paul M. Warner |

Plaintiff Recovery Land Holding, LLC, also known as Brighton Recovery Center ("**Plaintiff**" or "**Brighton**"), by and through counsel, respectfully submits this Memorandum in Opposition to Defendant's Motion for Summary Judgment in opposition to the Motion for Summary Judgment ("**Motion**") filed by Defendant City of South Ogden ("**Defendant**" or "**City**"):

### <u>INTRODUCTION</u>

Through its Motion, the City seeks to invalidate Brighton's claims against a newly-adopted city ordinance ("Ordinance") that prohibits handicapped individuals from living in

single-family residential neighborhoods. As explained in more detail below, the City's Motion must be denied because: (1) the Ordinance is facially discriminatory, (2) the Ordinance was drafted with discriminatory intent, (3) the Ordinance causes a discriminatory impact on the disabled, and (4) the City failed in its affirmative duty to grant Brighton a reasonable accommodation to house an additional 12 disabled people for treatment for substance abuse and alcoholism at its facility. At the very last, there are disputed issues of fact as to the City's discriminatory intent and the discriminatory impact of the Ordinance.

While the language of the Ordinance purports to apply to all Group Living Arrangements ("GLA"), it was drafted with the sole purpose of restricting housing for the disabled. Numerous City Council, Planning Commission, city administrator, and citizen meeting minutes and emails confirm that the target of the ordinance is group housing for the disabled in general, and expansion by Plaintiff in particular. In fact, the Ordinance was specifically drafted to apply to all GLAs as a way around the Fair Housing Act, its alleged neutrality a cover for its true purpose of targeting the disabled. If Plaintiff cannot turn to the Court for relief from targeted discrimination, then it is left without refuge.

Finally, as is set forth more fully in *Plaintiff's Motion & Memorandum in Support of Alternative Rule 56(d) Motion* that is filed concurrently herewith, the City has filed its Motion before any discovery has occurred in this matter. For this reason, if the Court is not simply inclined to deny the Motion outright, it should, at a minimum, hold its ruling in abeyance until after the Plaintiff has had the opportunity to conduct discovery to more fully respond to the City's factual assertions.

<u>**RESPONSE TO "STATEMENT OF UNDISPUTED MATERIAL FACTS"**</u>

While Brighton only objects to one of the City's "Statement of Undisputed Material Facts," Brighton maintains that the Motion cannot be decided solely on the facts brought forward in the City's "Statement of Undisputed Material Facts."

2

18.     The Brighton Documents include documents used by the City Council to support the findings it made in Ordinance No. 16-20, which are found in the Appendix as **Exhibit 11.**

**RESPONSE:**  Denied. Plaintiff disputes that the City Council actually read or considered the identified documents as part of its decision-making process.  Plaintiff lacks sufficient information upon which to form a belief as to the truth or falsity of this statement and, thus, denies this fact until further discovery is conducted. Pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, Plaintiff needs "time to obtain affidavits or declarations or to take discovery." *Id.*

## STATEMENT OF ADDITIONAL MATERIAL FACTS

1.     Mr. Daniel McDonald, counsel for the City in the present case, was hired by the City to "review South Ogden City code for Facilities for Persons with Disabilities (specifically the section on Reasonable Accommodation)" and to "work with City Council to discuss their ideas, wants, desires, etc. related to the Reasonable Accommodation section."  Feb. 18, 2016 email, Ex. A.

2.     In a presentation to the City Council on April 19, 2016, Mr. McDonald admitted that the spacing requirement is facially discriminatory.  Mr. McDonald discussed a change Alpine City had made to its GLA zoning ordinance, and he explained that under the new ordinance, "other discriminatory provisions, like spacing requirements . . . were removed." Mr. McDonald also discussed how to draft city code around FHA requirements for the purpose of restricting housing opportunities for the disabled.  Mr. McDonald recommended that the Council "create a record for your decision that includes research (I can help you with that)."  City Council Meeting Minutes, attached hereto as Ex. B.

3.     Following the presentation, Mr. Walt Bausman, a South Ogden citizen heavily involved in the process, sent an email to two City Council Members stating that Mr. McDonald's involvement means the city has a better chance of resisting any expansion requests from Brighton.  April 20, 2016 Email, Ex. C.

4.     In all the staff emails regarding the Ordinance, the subject is referred to as "the discussion on residential facilities for disabled persons," and not GLAs in general, illustrating that the alleged neutrality of the Ordinance is a pretense for directly targeting handicapped individuals. See, e.g., Sept. 2, 2016 email, Ex. D.

5.     Mr. McDonald conceded that a problem with the Ordinance is that it "doesn't put any limitations on the number of people or residents but we are limiting RFDPs [Residential Facilities for Disabled Persons] at 8 persons," and that "[w]e can always say that we are giving RFDPs somewhat better treatment because they are a permitted use where many GLAs are only conditional uses but that's the extent of it." Aug. 19, 2016 Email, attached hereto as Ex. E.

6.     Mr. McDonald cherry-picked studies, affidavits and research that do not provide any competing views or opinions on GLAs to supply to the City Council as support for their decision.  Council Packet, Ex. F.

7.     After the studies were supplied to City officials, Mr. Bausman sent another email

to City Council members stating: "I think this bodes well for us in dealing with BRC [Brighton] now, and hopefully for limiting other rehab facilities in the future. Obviously it's a shame we didn't have Dan McDonald representing the city in the first place." June 29, 2016 email, Ex. G.

8.     Due to the pre-existing GLAs located in the city, the spacing requirement combined with the exclusion of GLAs from single family residential zones bars any new GLAs from over 75% of the city, with much of the remaining 25% taken up by a cemetery and a country club golf course.  Map of South Ogden City, attached hereto as Ex. H.

9.      Brighton submitted evidence to the City of the drastic shortage of available housing for disabled individuals, explaining that Weber County has a maximum potential of 28 beds for private residential treatment for adults (including the 20 beds currently at Brighton's facility), while there are approximately 9,692 adults in Weber County with substance abuse disorders who are not treated in the public system.  Ex. I & J.

10.    Brighton also submitted a traffic impact study completed by Avenue Consultants that evaluated how the proposed increase in residents may influence traffic patterns and concluded that "the traffic impacts from the additional staff and patients will be imperceptible during peak travel periods and no traffic impact is anticipated for any other time periods to the adjacent roadway networks."  Ex. K, p. 2.

## SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Rost ex rel. K.C. v. Steamboat Springs RE-2 School Dist.*, 511 F.3d 1114, 1118-19 (10th Cir. 2008) (quotations and citation omitted). "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Schutz v. Thorne*, 415 F.3d 1128, 1132 (10th Cir. 2005).  The burden of proving the nonexistence of a genuine issue of material fact is on the moving party.  *Adamson v. Multi Cmty. Diversified Servs., Inc.,* 514 F.3d 1136, 1145 (10th Cir. 2008).  When considering a motion for summary judgment, the court must not weigh evidence or assess credibility." *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1022 (10th Cir. 2007) (concluding that "'[c]redibility facts are jury functions, not those of a judge'") (quoting *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 255 (1986)).  And the Court

must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Schutz*, 415 F.3d at 1132. "If the evidence presented on a dispositive issue is subject to conflicting, reasonable interpretations, summary judgment is improper." *SCO Grp., Inc. v. Novell, Inc.*, 578 F.3d 1201, 1218 (10th Cir. 2009).

## ARGUMENT

## I.  THE CITY'S MOTION FAILS BECAUSE THERE IS A DISPUTE OF MATERIAL FACT AS TO INTENTIONAL DISCRIMINATION

The crucial issue under Brighton's first theory of recovery – disparate treatment – is whether the City intentionally discriminated against handicapped people in passing Ordinance 16-20. *Honce v. Vigil*, 1 F.3d 1085, 1088 (10th Cir.1993) ("The ultimate question in a disparate treatment case is whether the defendant intentionally discriminated against plaintiff.") Intentional discrimination may be proven by either direct evidence of discrimination or circumstantial evidence under the McDonnell Douglas burden shifting scheme. *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 919 (10th Cir. 2012). As discussed below, Brighton can do both.

The City claims that Brighton "has no direct or indirect proof of discrimination" (Motion at p. 10), but this argument ignores (1) that the Ordinance is facially discriminatory, (2) the statements of several city officials, administrators, citizens, and the City's own counsel, and (3) the fact that the Ordinance was drafted and approved with the specific intention of targeting group homes for the handicapped in general, and the expansion of Brighton's capacity specifically. There is sufficient direct and circumstantial evidence of discrimination to establish a genuine dispute of material fact as to intentional discrimination.

## A.  Ordinance 16-20 is Facially Discriminatory

Direct evidence of discriminatory intent is shown where "the discriminatory intent and

purpose of the Act [or] Ordinance are apparent on their face." *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1500 (10th Cir. 1995). The Ordinance is facially discriminatory in two ways:

First, the Ordinance is facially discriminatory because it "facially single[s] out the handicapped and appl[ies] different rules to them." *Id.* at 1500. Under the Ordinance, GLAs include assisted living units, boarding houses, lodging houses, nursing homes, senior housing, assisted living facilities, nursing care facilities, dormitories, student housing, fraternities, clubs, institutional groups, halfway houses, convents, monasteries, as well as GLAs for the handicapped, defined as Residential Facilities for Disabled People ("RFDP"). City Code § 10-2-1. The Ordinance limits RFDP to "no more than eight (8) disabled persons." *Id.* However, the City Code does not place a cap on any other type of GLA. *Id.* While two other types of GLAs also potentially house the disabled - "Assisted Living Units" and "Nursing Homes," both of which are defined as residences for the elderly – the city does not set a cap on those. *Id.* This differential treatment among GLAs is facially discriminatory and illustrates animus by the City against disabled people recovering from substance abuse and alcoholism, who are restricted to living in RFDP with an 8-person cap.

The City attempts to argue that the 8-person cap on RFDP is "benign discrimination" that is actually favorable to the disabled. Motion at p. 14. However, this argument ignores the lack of a cap on any other GLA. Further, the Ordinance was drafted with a built-in accommodation of 8 disabled people precisely so the City could make this argument; the accommodation is merely a pretext to cover the City's true intent. Dan McDonald, the drafter of the Ordinance and counsel for the City in this case, admitted as much in an email to City Manager Matt Dixon:

> As we have discussed in the past, this ordinance is not a silver bullet, nor is it perfect. One thing that bugs me just a little about where things sit at the present is that the zoning ordinance explicitly or implicitly allows different types of GLAs, like nursing homes, etc. but doesn't put any limitations on the number of people or residents but we are limiting RFDPs at 8 persons. A lot of cities will define how many people can live in a dorm, a nursing home, etc. so limiting RFDPs to 8

6

does not cause a problem. I could still see the disabled rights activists complaining that we put no numerical limitation on other GLAs while we limit RFDPs to 8 persons. We can always say that we are giving RFDPs somewhat better treatment because they are a permitted use where many GLAs are only conditional uses but that's the extent of it. If we limited college dorms to 6, for example, our allowing 8 for an RFDP bolsters our position.

So what I am saying is that what we have done here is an improvement, but without really tinkering with the existing code and making policy decisions about numerical limitations on all types of GLAs, it's still not perfect. We can fix it and strengthen it by putting limits (lower than 8) on certain types of GLAs.

Ex. E.  It is undisputed that the Ordinance is discriminatory against the handicapped because it singles them out as the only GLA with a numerical limitation.

Second, the Ordinance's 2,640-foot spacing requirement is facially discriminatory. *Larkin v. State of Mich. Dept. of Social Services*, 89 F.3d 285, 289-90 (6th Cir. 1996) (holding that a 1,500-foot spacing requirement between residential facilities was facially discriminatory). The Ordinance is facially discriminatory even though the spacing requirement may apply to GLAs for non-disabled people.  *Horizon House Dev. Servs., Inc. v. Township of Upper Southampton*, 804 F. Supp. 683, 694 (E.D. Penn. 1992) (holding that a 1,000-foot spacing requirement for group homes was facially invalid and the "distance requirement was not any less illegal as to people with handicaps just because it also had an impact on some group homes for people without handicaps.")  Mr. McDonald admitted that the spacing requirement is facially discriminatory in a presentation to the City Council on April 19, 2016.  Ex. B.  During that slideshow presentation, Mr. McDonald discussed a change Alpine City had made to its GLA zoning ordinance, and he explained that under the new ordinance, "other discriminatory provisions, like spacing requirements . . . were removed."  *Id.* at 95.

The spacing requirement essentially bars any new GLAs from locating anywhere within the city, as evidenced by the map attached hereto as Exhibit M.  This map shows that, due to the pre-existing GLAs located in the city, the spacing requirement combined with the exclusion of

7

GLAs from single family residential zones bars any new GLAs from over 75% of the city, with much of the remaining 25% taken up by a cemetery and a country club golf course. *Id.* As these options are not feasible for new GLAs, the Ordinance serves as a barrier to any new group living facilities for handicapped people from locating anywhere within the city, thereby depriving the handicapped from the right to live in a residential neighborhood. *See Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 787 (7th Cir. 2002) ("Because the spacing ordinance draws a nearly half mile circle around each existing group home, it currently precludes new group homes from opening in most of the City of Milwaukee, thus preventing disabled adults who cannot live without some support from residing in almost all residential neighborhoods within the City. . . . A variance was absolutely essential for the plaintiffs to have the equal opportunity to live in a residential community.")

Both the spacing requirement and the 8-person cap on Residential Facilities for Disabled Persons are facially discriminatory, and as such the Ordinance violates the FHA, ADA and RA. Accordingly, the City's Motion should be denied.

**B.**     **Plaintiff Can Establish a Prima Facie Case of Discrimination Under the McDonnell Douglas Test**

Even if the Ordinance were not facially discriminatory, circumstantial evidence of discrimination is sufficient to meet Brighton's prima facie burden under the *McDonnell Douglas* burden shifting scheme.

For the first step in the *McDonnell Douglas* analysis, a plaintiff "bears the obligation of coming forward with a prima facie case of discrimination, a case that must include evidence suggesting the city denied the variance because of the disability of [plaintiff's] residents." *Cinnamon Hills*, 685 F.3d at 920. "The burden of establishing a prima facie case of disparate treatment is not onerous." *Tex. Dep't Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Flexibility is essential to the approach: "the precise requirements

of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.'" *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (*quoting Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)).  In discrimination cases, "the prima facie case is a flexible standard that may differ according to differing fact situations." *Mohammed v. Callaway*, 698 F.2d 395, 398 (10th Cir. 1983).

A prima facie case of discrimination may be established if the plaintiff provides evidence that "animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." *Turner v. City of Englewood*, 195 F. App'x 346, 353 (6th Cir. 2006).  The circumstantial evidence of discriminatory intent may be inferred from the "totality of circumstances" from several sources, including: "the historical background of the decision, the specific sequence of events leading up to the challenged decision, departures from the normal procedural sequence, and the legislative history and contemporary statements by members of the decision-making body."  *Id.* at 354.

City emails, council agendas and minutes all establish the City's primary purpose in drafting and approving the Ordinance was to thwart rehabilitation centers for the handicapped, and more specifically Brighton, and to prevent them from building or expanding facilities within the City.  Mr. McDonald was hired by the city to "review South Ogden City code for Facilities for Persons with Disabilities (specifically the section on Reasonable Accommodation)" and to "work with City Council to discuss their ideas, wants, desires, etc. related to the Reasonable Accommodation section."  Ex. A.  In his initial presentation to the City Council, Mr. McDonald only discussed residential treatment facilities for the handicapped and how to draft city code around FHA requirements to restrict housing opportunities for the disabled.  Ex. B.  Following the presentation, Mr. Walt Bausman, a South Ogden citizen heavily involved in the process, sent

an email to two City Council Members stating: "With a new land-use/reasonable accommodation attorney on board, the next round should be interesting. I think we have a much better chance of resisting the BRC [Brighton] expansion with attorney Dan MacDonald's participation, thanks mainly to [Councilmembers] Brent and Adam. His comments and direction for our R/A [Reasonable Accomodation] regulations seemed very positive." Ex. C. *See Bryant Woods Inn, Inc. v. Howard Cty., Md.*, 911 F. Supp. 918, 929 (D. Md. 1996), aff'd, 124 F.3d 597 (4th Cir. 1997) ("government officials are generally held to act with discriminatory intent, regardless of their personal views, when they implement the discriminatory desires of others.")

In all the staff emails regarding the Ordinance, the subject is referred to as "the discussion on residential facilities for disabled persons," and not GLAs in general, illustrating that the alleged neutrality of the Ordinance is a pretense for directly targeting handicapped individuals. For example, City Recorder Leesa Kapetenov sent an email to City staff and officials stating:

> Here's some background on the presentation and discussion on residential facilities for disabled persons. As you know, we recently adopted a new ordinance concerning residential facilities for disabled persons as written by Neil Lindberg, the consulting attorney during the monastery issue. It would seem, however, that some members of the city council felt the city should get another attorney's opinion concerning the ordinance, especially as it pertained to reasonable accommodation.

Ex. D. The protected group here is disabled people recovering from substance abuse and alcoholism and "animus against the protected group," was a significant if not the primary motivating factor in the adoption of the Ordinance.

The City asserts that Brighton can only establish a prima facie case of discrimination if it can show that other GLAs for 32 unrelated, non-disabled persons have been or would be allowed in the R-1-10 zone in the City. Motion at p. 18. However, such an inflexible and narrow characterization of the prima facie standard is contrary to well-established law.

Additionally, the City argues that its decision was made "after careful study and

10

considerable deliberation" and based on the findings drafted by Mr. McDonald. Motion at p. 11. The truth is that Mr. McDonald told the council he would supply the factual support for the Ordinance. In his recommendations at his April 19, 2016 presentation to the City Council, Mr. McDonald recommended that the Council "create a record for your decision that includes research (I can help you with that)." Ex. B at p. 97. However, there is no evidence to suggest that the City's decision was based on the paper trail supplied by Mr. McDonald at all. None of the city council or planning commission minutes discuss the studies or other supplied evidence. Further, even if the city officials did rely on this evidence, Mr. McDonald cherry-picked studies, affidavits and research that do not provide any competing views or opinions on GLAs, such that the information supplied was biased and inappropriate for making a well-researched, fair, and reasoned decision. Ex. F. The evidence does, however, support that the City's decision was based on animus against Brighton and rehabilitation centers for the handicapped. After the studies were supplied to City officials, Mr. Bausman sent another email to City Council members stating: "I think this bodes well for us in dealing with BRC [Brighton] now, and hopefully for limiting other rehab facilities in the future. Obviously it's a shame we didn't have Dan McDonald representing the city in the first place." Ex. G.

Brighton has clearly met the burden of establishing a prima facie case of discriminatory intent, or at the very least established that there is a genuine dispute of material fact as to the City's discriminatory intent. Alternatively, Brighton should be allowed to conduct further discovery under its concurrently-filed Rule 56(d) Motion in order to depose City officials and administrators as to their intent, the legislative history, and the circumstances leading up to and surrounding the approval of the Ordinance.

## II. THERE IS A GENUINE DISPUTE OF FACT AS TO THE ORDINANCE'S DISPARATE IMPACT ON THE DISABLED

The Ordinance disproportionately impacts disabled people. A disparate-impact claim

challenges a facially neutral policy that "actually or predictably results in ... discrimination." *Reinhart v. Lincoln Cty.*, 482 F.3d 1225, 1229 (10th Cir. 2007) (citations omitted). In order to establish a prima facie case of disparate impact, plaintiffs must show "they have been treated differently than similarly situated groups." *Corp. of Episcopal Church in Utah v. W. Valley City*, 119 F. Supp. 2d 1215, 1220 (D. Utah 2000). There are three factors courts consider in evaluating a plaintiff's disparate impact claim: "(1) the strength of the plaintiff's showing of discriminatory effect; (2) the defendant's interest in taking the action complained of; and (3) whether the plaintiff seeks to compel the defendant affirmatively to provide housing for members of a protected class or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing." *Mountain Side Mobile Estates P'ship v. Sec'y of Hous. & Urban Dev.*, 56 F.3d 1243, 1252 (10th Cir. 1995) (further explaining that "we must decide close cases in favor of integrated housing.").

Even if we assume that the Ordinance is a facially-neutral policy, it actually results in discrimination, in that the only groups actually affected – rehabilitation centers, assisted living facilities, and nursing homes – serve disabled people. Though Brighton has not yet had the opportunity to conduct discovery on this issue, Brighton believes that no other categories of GLAs, such as boarding houses, dormitories, or fraternities, have requested or will ever request to locate within single-family residential zones in the City. Moreover, there is demand for more GLAs for disabled people, while GLAs for non-disabled people are not a common land use in the City. Because there is a higher demand for GLAs that serve disabled people, the restrictive zoning adopted in the Ordinance disproportionately impacts disabled people because it restricts their ability to live in the neighborhood of their choice. Further, the balance weighs more in Brighton's favor because Brighton only seeks to add 12 beds to its existing building, without any change to the footprint of the structure, rather than seeking to compel the City to affirmatively provide housing for the disabled. Thus, there is a genuine dispute of fact as to the

12

disproportionately negative impact the Ordinance has on disabled people.

## III.   THE CITY FAILED IN ITS AFFIRMATIVE DUTY TO GRANT BRIGHTON A REASONABLE ACCOMMODATION

The Fair Housing Act "imposes an affirmative duty to reasonably accommodate handicapped persons." *City of Edmonds v. Washington State Bldg.Code Council*, 18 F.3d 802, 806 (9th Cir.1994), aff'd 514 U.S. 725 (1995).  Thus, the City had an affirmative obligation to grant Brighton's reasonable accommodation request if that request was "(1) reasonable and (2) necessary (3) to afford handicapped persons equal opportunity to use and enjoy housing." *Corp. of Episcopal Church in Utah v. W. Valley City*, 119 F. Supp. 2d 1215, 1221 (D. Utah 2000). While a court reviewing a City's denial of a reasonable accommodation request is confined to the administrative record, the City's denial of an accommodation must be supported by evidence that request is unreasonable or unnecessary.  *Lewis v. Draper City*, No. 2:09-CV-589 TC, 2010 WL 3791404, at *4 (D. Utah Sept. 22, 2010) (holding that City improperly denied an accommodation request for 24 disabled residents where City denied the request "without *any* evidence that the request was either unnecessary or unreasonable" (italics in original)).

Brighton requested a reasonable accommodation to allow it to address the great need in Utah for rehabilitation centers for people recovering from substance abuse and alcohol addiction by requesting to house an additional 12 residents, without altering the facility's footprint, without the need to increase the number of parking spaces, with only minor external modifications that would generally not be visible from neighboring properties, and with evidence of a negligible impact on traffic or public resources.  The evidence submitted to the City for both the initial application and the administrative appeal demonstrate that the accommodation requested for an additional 12 residents was both reasonable and necessary to afford the disabled people who might want to live in a residential neighborhood in the City an equal opportunity to do so.  At the very least, the evidence submitted by Brighton demonstrates that there is a genuine issue of

13

material fact as to whether the City failed in its affirmative duty to grant the reasonable accommodation.

     **A.**     **Brighton's Accommodation Request Is Necessary to Give Disabled People the Equal Opportunity to Live in Residential Neighborhoods.**

By limiting housing for disabled people to multi-family and commercial zones, the Ordinance violates the core goals of the FHA. Courts have held that equal opportunity means "giving handicapped individuals the right to choose to live in single-family neighborhoods, for that right serves to end the exclusion of handicapped individuals from the American mainstream." *Smith & Lee Assoc., Inc. v. City of Taylor, Mich.*, 102 F.3d 781, 794-95 (6th Cir. 1996), *see also Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002) (internal quotation marks omitted) (holding that "equal opportunity means the opportunity to choose to live in a residential neighborhood.") For instance, in *Hovsons, Inc. v. Township of Brick*, the Third Circuit considered a city code that excluded nursing homes from all residential districts. 89 F.3d 1096, 1099 (3rd Cir. 1996). The Court held that "[t]he Township of Brick's blanket exclusion of nursing homes from its residential areas in general, and its refusal to permit the construction of the specific facility in question, is precisely the sort of isolation of handicapped persons from the mainstream of society that the [FHA] was enacted to forbid." *Id.* at 1103.

Here, it is undisputed that the Ordinance confines disabled people to multi-family residential and commercial zoning districts. By doing so, the Ordinance denies disabled people an equal opportunity to live in single family neighborhoods, excludes them from the mainstream of society, and violates the FHA. Brighton's accommodation request was necessary to give disabled people the equal opportunity to live in single family neighborhoods.

The City argues that because it treats GLAs for disabled people and GLAs for non-disabled people equally, it has no obligation to grant a request for reasonable accommodation,

however this argument fails for two reasons: (1) it misapplies 10th Circuit case law and strains the holding in the *Cinnamon Hills* case, and (2) it ignores the undisputed fact that group living is necessary for disabled people to have the same opportunity to live as the non-disabled, so a group-to-group comparison ignores their handicap.

*Cinnamon Hills* did not expressly adopt a group-living (handicapped) to group-living (non-handicapped) comparison for reasonable accommodation claims, and the City cannot point to any express language in the decision to support its argument. Motion at p. 23. What *Cinnamon Hills* does say is that the reasonable accommodation mandate requires "changes in otherwise neutral policies that preclude the disabled from obtaining the same opportunities that those without disabilities automatically enjoy." *Cinnamon Hills*, 685 F.3d at 923 (internal quotation marks omitted). The court based its decision on the housing options available at the individual level: "no one, disabled or otherwise, is generally allowed to stay in a motel for more than 29 days or to reside in a C–3 commercial zone." *Id.* At the individual level, the non-disabled automatically enjoy the opportunity to live in single family residential neighborhoods. Under the Ordinance, the disabled do not have that opportunity because they require group living (as discussed below), which is expressly prohibited in single family residential zones under the Ordinance. In order for the disabled to enjoy the same housing opportunities as everyone else, they require an accommodation from the Ordinance. The City tries to argue that because 32 non-disabled people cannot live in one residence, that there is no equal opportunity being denied; however, this disregards *Cinnamon Hills'* focus on the individual level, and the fact that non-disabled people can live on their own in a single-family residence, but those with a disability cannot. The City's theory would allow any municipality to use the group-to-group comparison to circumvent the FHA and exclude disabled people from residential zones in every instance.

4817-3753-6385.3

**B.      Brighton's Accommodation is Necessary to Serve the Demand for Substance Abuse Treatment**

Brighton's requested accommodation is necessary to help serve the substantial demand for substance abuse treatment residences in Utah, and Brighton has provided the City with ample evidence to demonstrate this necessity.  The City's arguments against Brighton's evidence are based on a misinterpretation of 10th Circuit case law.

Contrary to the City's assertion, the 10th Circuit has not rejected the market necessity method of proving that an accommodation is "necessary," and this Court has in fact expressly recognized it.  In *Corp. of Episcopal Church in Utah v. W. Valley City*, this Court found that West Valley City had failed to reasonably accommodate a residential treatment center for those recovering from addiction, reasoning that "Plaintiffs have asserted that there is a great need for Haven West to be a group facility located in a residential neighborhood. Those recovering from addiction have been shown to benefit from living with others in similar situations, and their presence in residential neighborhoods allows the recovering individuals to re-integrate into the community at large. . . . It thus appears that ***there is currently no other way for recovering addicts who require this facility to receive housing in West Valley City***."  119 F. Supp. 2d at 1221–22. (emphasis added).

The *Cinnamon Hills* case does not address market necessity at all.[1]  Rather, the plaintiff in *Cinnamon Hills* argued that its facility was necessary "because it would ease the transition of emotionally and mentally troubled youth from residential treatment back into society" without any discussion of the unavailability of such housing elsewhere or the demand for such housing. *Cinnamon Hills*, 685 F.3d at 924.  In fact, the *Cinnamon Hills* case expressly cites to *Bryant Woods Inn, Inc. v. Howard Cty., Md.*, a 4th Circuit case indicating that necessity could be proven

---

[1] The 10th Circuit Court could have overruled the reasoning from *Corp. of Episcopal Church* in its *Cinnamon Hills* opinion, but it did not do so.  *Cinnamon Hills*, 685 F.3d at 923

by showing a demand for rehabilitation housing, but holding that no necessity existed where "the unrefuted evidence is that the vacancy rate [for rehabilitation housing] was between 18 to 23% within Howard County." 124 F.3d at 605.

Unlike the plaintiffs in *Cinnamon Hills* and *Bryant Woods Inn, Inc.*, Brighton submitted evidence to the Hearing Officer of the drastic shortage of available housing for disabled individuals, explaining that Weber County has a maximum potential of 28 beds for private residential treatment for adults (including the 20 beds currently at Brighton's facility),[2] while there are approximately 9,692 adults in Weber County with substance abuse disorders who are not treated in the public system.[3]  Ex. I.  Further, Brighton explained that drug abuse in Utah is a public health crisis, that opioid abuse is an acute and growing problem, and that downtown Ogden has a significantly higher prescription opioid death rate when compared with the rest of the state.  Ex. I.

The City argues that "not all recovering addicts need group living" and, in support of its position, cites *Tsombanidis v. W. Haven Fire Dept.*, 352 F.3d 565, 577 (2d Cir. 2003) (internal quotation marks omitted) (alterations omitted).  The City fails to cite to the rest of the case, which states that "there is evidence that these particular plaintiffs needed to live in group homes located in single-family areas."  *Id.* at 580.  *Tsombanidis* is consistent with numerous other cases

---

[2] The Utah Department of Human Services Office of Licensing ("Office of Licensing") is responsible for licensing facilities that provide substance abuse treatment.  The Office of Licensing has issued adult residential treatment licenses to two facilities in Weber County.  Exhibit J.  First, Brighton Recovery Center has a license to provide residential treatment to 20 adults.   Notably, Brighton Recovery Center is the only residential treatment facility licensed in South Ogden City.  A second facility, Spirit Mountain Recovery, is licensed to provide residential treatment to 4 adults.   Brighton believes that Ogden Regional Hospital has the ability to provide residential treatment for 3 to 4 people, although it does not have a separate license from the Office of Licensing to do so.

[3] The Utah Division of Substance Abuse and Mental Health ("SAMH") collects data regarding substance abuse disorders.  In its 2016 Annual Report, SAMH reported that, in 2015, "134,172 adults in Utah were classified as needing treatment for alcohol and/or drug dependence or abuse." Exhibit I, 18.  Utah's public system was able to serve the needs of 13,400 adults, or 10% of the relevant population.  In other words, the public system was unable to serve 120,772 adults who need treatment for alcohol and/or drug dependence.  The data reported for Weber County is equally stark.  SAMH identified 11,152 adults in need of treatment.  Exhibit I, 18.  Public services in Weber County were able to serve 1,460 adults, or 13% of the population in need.  This leaves approximately 9,692 adults who are in need of treatment, but could not be served by the public system.

17

that hold that group homes are necessary to permit certain disabled people to live in residential areas and necessary for their rehabilitation.   See *Corp. of Episcopal Church in Utah*, 119 F. Supp. 2d at 1222 ("Those recovering from addiction have been shown to benefit from living with others in similar situations, and their presence in residential neighborhoods allows the recovering individuals to re-integrate into the community at large"), *Lewis*, 2010 WL 3791404, at *5 ("disabled who want to live in a residential neighborhood may have no choice but to live in a 'commercial' home; a residential group home is fundamentally residential in character"), *Oconomowoc*, 300 F.3d at 784 ("Often, a community-based residential facility provides the only means by which disabled persons can live in a residential neighborhood, either because they need more supportive services, for financial reasons, or both"), *Groome Res. Ltd., L.L.C. v. Par. of Jefferson*, 234 F.3d 192, 201–02 (5th Cir. 2000) ("[T]he discriminatory effect recognized by Congress resulted from the fact that the disabled were not able to live safely and independently without organized, and sometimes commercial, group homes"), *Lapid-Laurel, L.L.C. v. Scotch Plains*, 284 F.3d 442, 459-60 (3d Cir. 2002) (holding that location in a single family neighborhood, not necessarily in a single family dwelling, serves to help integrate disabled people into the American mainstream).  Thus, the accommodation was necessary both to meet market demand and because of a demonstrated need for those recovering from addictions to live in a group home with support services, such as Brighton's.

     **C.**    **Brighton's Accommodation Request Is Reasonable**

Brighton's requested accommodation is reasonable because it will not fundamentally alter the neighborhood, it requires minimal modifications to the facility, and it will have an imperceptible impact on neighborhood traffic.  The City's arguments against reasonableness are based on the facility as a whole, and not on the additional 12 residents requested by the accommodation.  In approving Brighton's initial accommodation for 20 residents, the City already decided that the facility's uses are consistent with zoning and the character of the

surrounding residential neighborhood, and nothing about the additional 12 residents alters that.

"An accommodation is reasonable if it is both efficacious and proportional to the costs to implement it." *Oconomowoc*, 300 F.3d at 784. On the other hand, an accommodation is unreasonable if it "'impose[s] undue financial and administrative burdens'" or it would fundamentally alter the City's zoning program. *Corp. of Episcopal Church in Utah*, 119 F. Supp. 2d at 1221 (quoting *Bryant Woods*, 124 F.3d at 604).[4] The City has conceded that "[t]here is no indication in the record or otherwise that granting the accommodation would impose an undue financial or administrative burden on the City." Memorandum Decision at p. 15. Ex. 4 to the Motion.

The accommodation requested here – an increase of 12 residents – will not fundamentally alter the zoning scheme as it will have an imperceptible impact on the neighborhood. The internal improvements required to accommodate 12 new residents will not alter the facility's footprint. Application, Ex. 1 to the Motion. The minor external modifications that are proposed will generally not be visible from neighboring properties. *Id.* The total number of parking spaces for the Facility will remain the same. *Id.* Brighton submitted a traffic impact study completed by Avenue Consultants ("Avenue"). Ex. K. The study evaluated how the proposed increase in residents may influence traffic patterns, and Avenue concluded that "the traffic impacts from the additional staff and patients will be imperceptible during peak travel periods and no traffic impact is anticipated for any other time periods to the adjacent roadway networks." Ex. K, p. 2. Because the requested accommodation will have no impact on neighborhood traffic,

---

[4] The City argues that the burden of proving reasonableness is on the applicant, and it cites *Keys Youth Servs., Inc. v. City of Olathe, KS*, for that proposition. Motion at p. 37. However, that case only held that the applicant bears the burden of proving necessity and did not address the burden relating to reasonableness. 248 F.3d 1267, 1275 (10th Cir. 2001). This Court has recognized that "[t]here is a circuit split on the question of which party bears the burden of showing if an accommodation is reasonable. Most circuits place the burden with the plaintiff. *See Bryant Woods,* at 604. The Third Circuit, however, places the burden with the defendant. *See Hovsons v. Township of Brick,* 89 F.3d 1096 (3rd Cir.1996). The Tenth Circuit has not spoken on this issue." *Corp. of Episcopal Church in Utah*, 119 F. Supp. 2d at 1221, n1. But just as the plaintiff in *Corp. of Episcopal Church*, the Court need not decide which party bears the burden because, "even if the burden is on Plaintiffs, it has clearly been met." *Id.*

vehicle trips associated with the requested accommodation will not fundamentally alter the zoning district.

In summary, Brighton is entitled to a reasonable accommodation to allow treatment of an additional 12 disabled people for substance abuse and alcoholism at its facility because: disabled people do not have an equal opportunity to choose to live in a residential neighborhood without it, there is a high demand for treatment for adult substance use disorder in Weber County and a very limited number of residential treatment facilities, and the addition of 12 residents will not fundamentally alter the City's zoning district or impose any undue burden on the City.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion for Summary Judgment.

DATED this 21st day of December, 2018.

**Snell & Wilmer L.L.P.**

  /s/ Timothy J. Dance
Timothy J. Dance
Kristen J. Overton
*Attorney for Plaintiff*

20

**CERTIFICATE OF SERVICE**

I hereby certify that on December 21, 2018, I caused a true and correct copy of the foregoing to be served by electronic court filing notification through the Court's CM/ECF system to all participants of record.

/s/ Sarah Nielsen

4817-3753-6385.3